565 So.2d 309 (1990)
Judy A. BUENOANO, Appellant,
v.
STATE of Florida, Appellee.
No. 76150.
Supreme Court of Florida.
June 20, 1990.
*310 Larry Helm Spalding, Capital Collateral Representative, and Billy H. Nolas, Chief Asst. C.C.R., Office of the Capital Collateral Representative, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Judy A. Buenoano, a prisoner under sentence of death and the Governor's death warrant, appeals from a summary denial of relief in the circuit court on a motion filed pursuant to rule 3.850, Florida Rules of Criminal Procedure. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The facts of the crime of which Buenoano was convicted are recited in her initial appeal to this Court. Buenoano v. State, 527 So.2d 194, 195-96 (Fla. 1988). We affirmed the denial of her motion for postconviction relief and denied her petition for habeas corpus in Buenoano v. Dugger, 559 So.2d 1116 (Fla. 1990).
The crux of Buenoano's present claim relates to the circumstances surrounding the recent execution of Jesse Tafero on Friday, May 4, 1990. When Tafero's electrocution began, smoke and flames instantaneously spurted from his head for a distance of as much as twelve inches. The flames and smoke emanated from the area around a metallic skull cap, inside of which was a saline-soaked synthetic sponge meant to increase the flow of electricity to the head. The cap is the source of electricity administered to condemned prisoners by the electric chair.
Because of the smoke and flames, officials of the Department of Corrections stopped the first surge of electricity. A second jolt again resulted in smoke and *311 flames spurting from Tafero's head. Finally, a third jolt of electricity was administered. A medical examiner found that Tafero was dead some six or seven minutes after the execution commenced.
Thereafter, the Governor ordered the Department of Corrections to conduct an investigation into the circumstances of Tafero's execution. The Department reported that the equipment was in proper working order. However, it was determined that for the first time a synthetic, rather than a natural, sponge had been used in the headpiece. The Department concluded that the burning of the sponge caused the flames and smoke which were seen during Tafero's execution. Dr. Kilgo, the attending physician, submitted an affidavit stating that with the initial surge of electricity Tafero had no further conscious mental awareness or sensate appreciation. Dr. Hamilton, the medical examiner, stated that "the first jolt obliterated consciousness." The Department concluded that Tafero did not suffer from any unusual or prolonging effects due to the circumstances attendant to his execution. The Department also noted that most executions last longer than seven minutes.
In this appeal, Buenoano contends that her execution would be cruel and unusual punishment because of the malfunctions in the electric chair. Armed with the affidavit of an electric chair designer, she argues that the fault in Tafero's execution lay with a "homemade" electrode in the chair that inadequately conducts electricity, thus increasing the possibility of burning and slow death. Alleging that the defect in the electrode has not been remedied, she says that she could face cruel and unusual punishment because Tafero's execution demonstrated that the Department of Corrections is "incompetent to carry out executions."
Initially, the state argues that Buenoano is barred from arguing this issue for failure to raise it in her prior rule 3.850 proceeding. The state suggests that Buenoano should have previously raised the issue of a probable malfunction in the electric chair. We disagree. Buenoano's claim rests primarily upon facts which occurred only recently during Tafero's execution. We find the claim is not procedurally barred.
Turning to the merits, we note that the execution of condemned prisoners is clearly a matter within the province of the executive branch of government. § 922.09, Fla. Stat. (1989). It must be presumed that members of the executive branch will properly perform their duties. The Department of Corrections conducted an investigation and concluded that the irregularities in Tafero's execution were caused by the use of a synthetic sponge. We do not find that the record as proffered justifies judicial interference with the executive function to require an evidentiary hearing to determine the competence of the Department of Corrections to carry out Buenoano's execution. Death by electrocution is not cruel and unusual punishment, and one malfunction is not sufficient to justify a judicial inquiry into the Department of Corrections' competence. See Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947) (plurality opinion).
We affirm the denial of Buenoano's motion for postconviction relief. No petition for rehearing shall be permitted.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD and GRIMES, JJ., concur.
SHAW, J., dissents with an opinion, in which BARKETT and KOGAN, JJ., concur.
BARKETT, J., dissents with an opinion, in which KOGAN, J., concurs.
KOGAN, J., dissents with an opinion.
SHAW, Justice, dissenting.
In my opinion, the trial court should have conducted an evidentiary hearing to determine as a matter of fact whether the problem that caused the malfunction at Tafero's execution has been corrected. Buenoano alleges that the problem remains. The events surrounding Mr. Tafero's execution were highly unusual and, in my opinion, *312 were sufficiently egregious to warrant such a factual determination in the present case. It is our state courts' duty to ensure that each and every execution carried out in Florida is completed in a manner that is neither cruel nor unusual.
BARKETT and KOGAN, JJ., concur.
BARKETT, Justice, dissenting.
To my knowledge this is the first time any court has ever held that it is the executive branch that decides, without question or appeal, a constitutional claim of cruel or unusual punishment. Interpreting the constitution is a judicial function. It may not constitutionally be carried out by either the legislative or executive branches unless it is subject to judicial review. As this Court has said,
The Constitution vests "the judicial power of the state" in designated courts, each having jurisdiction of defined classes of cases... . This power is the means provided by the Constitution for authoritatively determining in litigated cases the meaning and intent of pertinent provisions of the Constitution itself ... and whether executive or administrative action ... accords with the Constitution ... so that the court may give appropriate effect to the applicable governing law in adjudicating rights.
Getzen v. Sumter County, 89 Fla. 45, 49-50, 103 So. 104, 106 (1925).
Judy Buenoano has made a simple constitutional claim: The electric chair is not working properly. Because of a malfunction, she says, it will cause an unusually torturous death in violation of the eighth amendment.[1] She supports her claim with affidavits of experts who are ready, willing, and able to testify in person.
The state disputes her claim and argues that the malfunction, which it concedes occurred, has been repaired by substituting a natural sponge for a synthetic sponge in the skull cap of the electric chair. Buenoano replies that a malfunctioning electrode, rather than the sponge, caused the problem, thereby disputing the assertion that the chair has been fixed.
Buenoano may be factually correct, or the state may be factually correct. Until today, a neutral magistrate would have been expected to hear the evidence presented, make a finding of fact, and based thereon, determine if the method of death was cruel or unusual punishment.
Today, however, the majority, in denying a hearing, departs not only from any semblance of due process but from any process at all. It does so without any legal support or analysis. The majority simply proclaims that the state may choose any method of death, and the method cannot be challenged, because we "presume" that the state cannot be wrong.
The only relief sought by Buenoano is a hearing. She asks for an opportunity to present her proof to a judge so she will not die in torturous fashion. The majority concedes that there is no procedural impediment to her claim. Why then can she not have her hearing? Because, the majority says, we trust the state has done its job, if the state says it has. Never mind that every principle of constitutional law has been developed by the very same procedure attempted here, to wit, a challenge to the state's action.
Although relief is foreclosed to Buenoano, according to the majority, she can die taking comfort in knowing that her death may contribute to some other person's relief if her execution, and perhaps countless others, proves to be as horrible as Tafero's. Only then, according to the majority, will there have been a sufficient number of malfunctions to justify even a judicial inquiry.[2] This is a bizarre twist to death penalty jurisprudence. It is even more bizarre when one considers the pragmatic implications here. The state conceded at oral argument that it has spent more time and money disputing Buenoano's claims in *313 court than it would have spent simply by replacing the alleged malfunctioning electrode.
The humane thing to do, not to mention the more economical and efficient thing to do, would have been simply to replace the electrode that Buenoano's experts say malfunctioned. That would have caused no delay in the administration of the penalty, contrary to the delay caused by litigating this simple claim. I guess this is too easy a solution.
KOGAN, J., concurs.
KOGAN, Justice, dissenting.
Although the problems that accompanied Tafero's execution clearly were accidental and unintentional, the mere fact that they happened requires that adequate measures be taken to prevent the likelihood of a recurrence. I thus must respectfully dissent from the majority's views, since I do not believe the executive branch has taken any meaningful step to investigate or correct the possible malfunctioning of the electric chair.
Indeed, the record before this Court discloses no more serious investigation than a so-called "experiment" involving a piece of dry sponge from the electric chair skull cap, which was placed in a kitchen toaster and heated for ten seconds. According to the Department of Corrections (DOC), this "experiment" supposedly has proven that the sponge was the source of the smoke and flame that enveloped Tafero's head on May 4.
I cannot agree that this "experiment" has any relevance in this proceeding. As the record clearly shows, the synthetic sponge was soaked in salt water on the day of the execution, whereas the sponge was dry when placed into the toaster. We have absolutely no rational basis for concluding that the radiant heat produced by a household toaster in any meaningful sense replicated the conditions caused by electricity passing through a sponge soaked in saline solution. Electricity and heat are not the same thing.
It is a basic scientific fact that saline solution conducts electricity fairly efficiently. Electricity passing through a saline-soaked sponge thus may produce only a minimal amount of heat, because heat is caused only by the resistance of the material through which electricity passes. Little heat is generated if electricity flows with relative efficiency, as it generally does through salt water solutions. In fact, this is the precise reason the sponge is soaked with saline solution  to better conduct electricity into the condemned prisoner.
These conclusions are strongly supported by the record. How is it possible, for example, that any piece of the sponge remained for testing if the sponge had burst into flame at the execution? Yet as DOC's own affidavit states:
It was important to demonstrate whether the newly acquired sponge would produce the amount of smoke that was present on May 4, so a piece of the sponge was cut from the headpiece insert which had been used during the execution. This piece was subjected to 120 volts of heat by placing it in a common household toaster. It took only five seconds to begin smoking and produced a noxious odor which became more intense as the sponge burned.
Although the sponge was only in the toaster for ten seconds, it produced a large amount of smoke and reduced in size by approximately two-thirds.

(Emphasis added.) I find it difficult to believe that any portion of the sponge would have remained intact if DOC's factual account of the execution were correct.
In fact, DOC presents this Court with a paradox. DOC asks us to believe that 120 volts caused the sponge to shrink by two-thirds in a mere ten seconds, but that three separate 2,000-volt surges over a six- to seven-minute period had two inconsistent results: (1) The sponge in the skull cap burst into profuse flames that literally danced around the head of Tafero during all three jolts of electricity; and yet (2) the sponge remained sufficiently intact that a piece could be removed for testing. Indeed, the fact that the sponge reduced its *314 volume by two-thirds after being placed in the kitchen toaster for ten seconds indicates not only that the sponge survived the electrical jolts, but that portions of it had not even melted to any significant extent. Otherwise, the sponge already would have been reduced in size prior to being placed in the kitchen toaster.
Thus, I find it difficult to believe the sponge was the only, or even the primary, reason for the flames that burst from Tafero's head on May 4. The state's own version of the facts is illogical and contrary to scientific principles.
Buenoano's arguments, on the other hand, make scientific sense. She contends that the actual fault lies with electrodes that do not properly conduct electricity through a human body. As a result, electricity sometimes passes through the condemned prisoner inefficiently, producing a good deal of heat. In other words, under Buenoano's theory the flames that arose around Tafero's head were not produced primarily by the sponge, but by Tafero's own body tissue being superheated by an inefficient flow of electricity through his body.
This gruesome possibility finds further support in the record. The autopsy report indicated a zone of burned flesh on the top of Tafero's head. Photographs of Tafero's body, which were submitted to this Court, indicated a large area of charred and blackened flesh on the top and left-hand side of the head. Surrounding the blackened flesh were patches of browned and reddened skin and a few places in which skin appeared to be peeling away from the skull. In addition, most of Tafero's eyebrows and eyelashes had been burned away, curled or singed by the flames, especially on the side of the head showing the most serious charring.
One eyewitness stated that Tafero continued to move and breathe after his head had caught fire. C.G. Strickland, Jr., superintendent of Community Facilities in Region II, gave the following account of Tafero's movements in between the jolts of electricity:
[T]here appeared to be more movement from Tafero than in the other twenty-one (21) executions that I have witnessed in the past. Having seen as many as I have, I believe it would be a fair statement to say that there was some malfunction in the equipment.
Another eyewitness who viewed Tafero's body shortly after the execution, attorney Susan Cary, filed a sworn statement detailing the condition of the head. She stated:
I have seen the bodies of three other inmates executed by officials of the Florida State Prison. I saw them at approximately the same length of time after they were executed as I saw Mr. Tafero's body. None of the other bodies I saw before had the severe burning and scorching and damage to the head as did Mr. Tafero's. None had any marks on the face at all.
The entire top of Mr. Tafero's head is covered with wounds. There is one dominant charred area and a myriad of smaller gouged, raw areas to the upper right side and lower right of the large burned area.
The dominant charred area is on the top left side of the head. It is larger than my hand... . The funeral director said that this was a third degree burn. The rest of that area was a dark brownish color, slightly lighter than the charred area. The funeral director said that this would be a second degree burn.
This record contains still other chilling accounts supporting Buenoano's theory of the electric chair's malfunction. According to Robert H. Kirschner, M.D., Tafero was not dead until the third jolt of electricity was administered and may have remained conscious during the first and second jolts. Kirschner also concluded that the charring of flesh occurred at least in part because Tafero did not receive the full 2,000 volts of electricity the chair is supposed to administer. Based on the autopsy reports and photographs of Tafero's body, Buenoano's counsel now argues that the voltage actually administered to Tafero may have been as little as 200 because of a faulty *315 electrode arrangement in the present electric chair.
Still other affidavits presented to this Court confirm a faulty design in the present electric chair. An expert in the design and construction of electric chairs, Fred Leuchter, Jr., reported that the Florida chair was not functioning properly because of its use of only a single "homemade" leg electrode. According to Leuchter, an electric chair needs electrodes attached to both legs in order to work properly. Leuchter also criticized the present leg electrode because it had been haphazardly constructed from an old Army boot and other spare parts.
This statement was confirmed by the man who actually fabricated the Army-boot electrode, Robin Adair. Adair stated that, while working at the prison, he created the present Army-boot electrode by riveting different types of metal and roofing material into the boot, together with a stainless steel bolt obtained from a hardware store. Adair specifically characterized this arrangement as "homemade."
This Court thus is faced with a ghastly possibility: A homemade electrode fashioned out of a used Army boot, spare parts, and roofing material may sometimes result in flames, smoke, and extensive charring of flesh during an execution. If the facts as alleged by Buenoano are true, even more serious malfunctions may occur in the future.
While the courts have upheld the validity of execution by swift electrocution, I believe that any electrical malfunction that results in needless charring of human flesh or an unnecessarily slow death is cruel and unusual punishment and thus is forbidden by the state and federal Constitutions. U.S. Const. amend. VIII; art. I, § 17, Fla. Const. This manner of execution would make a mockery of the constitutional requirement for swift and sure punishment. Art. I, § 17, Fla. Const.
For the foregoing reasons, I would reverse the court below and remand for an evidentiary hearing on whether the electric chair is malfunctioning. I specifically would order the trial court to determine whether there was any reasonable possibility that the flames that occurred during Tafero's execution were the result of a faulty electrode or electrodes. If any such possibility was supported by credible evidence or testimony in the hearing, I would instruct the trial court to stay the execution of Buenoano until the state overhauls the electric chair in a manner consistent with standards generally accepted in other states and by qualified experts.
I believe the courts of this state have authority to reach such a result under article I, section 17, of the Florida Constitution, which forbids cruel and unusual punishments. I also find no merit to any claim that the separation of powers doctrine prevents the courts from ordering the Department of Corrections to carry out an execution in a constitutional manner. While this Court shows deference to the acts of the coordinate branches of government, this deference necessarily is circumscribed by the Constitution, including the prohibition against cruel and unusual punishments.
I respectfully dissent.
NOTES
[1] I recognize, of course, that the electric chair is not intended to cause a pleasant form of death. But, it is intended to cause the swift death of the condemned prisoner.
[2] The majority says "one malfunction is not sufficient to justify a judicial inquiry." Majority op. at 311.