701 So.2d 76 (1997)
Leo Alexander JONES, Petitioner,
v.
STATE of Florida, Respondent.
No. 90231.
Supreme Court of Florida.
October 20, 1997.
Gregory C. Smith, Capital Collateral Regional Counsel-Northern District and Gail E. Anderson, Assistant Capital Collateral Regional Counsel, Tallahassee, Martin J. McClain, Litigation Director, Office of Capital Collateral Regional Counsel, Southern District, Miami, for Petitioner.
Robert A. Butterworth, Attorney General and Richard B. Martell, Chief, Capital Appeals, Tallahassee, for Respondent.
PER CURIAM.
Leo Alexander Jones, at a time when he was under warrant of death, filed a petition to invoke this Court's all writs jurisdiction, seeking a determination of whether electrocution in Florida is cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution and cruel or unusual punishment under article I, section 17 of the Florida Constitution.
In addition to arguing that execution per se is cruel and unusual punishment, he pointed to the circumstances surrounding the recent execution of Pedro Medina[1] to support his contention that execution in Florida's electric chair in its present condition is cruel *77 and unusual punishment. This Court rejected Jones's claim that execution was per se cruel or unusual punishment. However, the Court relinquished jurisdiction to the trial court to conduct an evidentiary hearing on Jones's claim that electrocution in Florida's electric chair in its present condition is cruel or unusual punishment. In order to provide the time necessary for the hearing, we stayed Jones's pending execution.
After a four-day hearing, the trial court entered an order denying the petitioner's claim. On appeal from that order, Jones argued that the trial judge had erroneously denied his motion for continuance. Jones asserted that none of his expert witnesses could be available to testify at the scheduled hearing. He also complained that during the course of the hearing, new written protocols for carrying out executions were then being developed based on recommendations of engineers who had examined the electric chair and that Jones's attorneys did not receive the new protocols until the second day of the hearing. As a consequence, he claimed that he was unable to effectively cross-examine the state's experts concerning these protocols. In addition, it was not until after the hearing that the State also provided Jones's attorneys with requested chart recordings pertaining to the performance of the electric chair during Medina's execution. In view of these circumstances, we once again relinquished jurisdiction to the trial court to hold an additional hearing in which the parties could present additional testimony and evidence, including the testimony of any witnesses who had testified at the previous hearing and that Jones could require two engineers who had testified for the State at the previous hearing to be present and undergo cross-examination. At the conclusion of the hearing, the trial judge was directed to consider the testimony and evidence presented at both hearings and enter a new order on the claim that electrocution in Florida's electric chair in its present condition is cruel or unusual punishment.
By subsequent order, we permitted Jones's experts to examine Florida's electrocution equipment and to witness the testing thereof by appropriate Florida officials. We also permitted Jones's attorneys to have access to certain requested evidentiary items concerning Medina's execution.
A second four-day evidentiary hearing was held. During the course of the two hearings, many witnesses testified and each side presented expert testimony from doctors and engineers. Thereafter, the trial judge entered a twenty-six page final order denying Jones's claim that Florida's electric chair in its present condition was unconstitutional. In the order of denial, the judge made several significant findings of fact which may be summarized as follows:
1. The procedures used in the last seventeen Florida executions have been consistently followed, and no malfunctions occurred until the execution of Pedro Medina.
2. The flame and smoke observed during Medina's execution were caused by insufficient saline solution on the sponge in the headpiece of the electric chair.
3. Medina's brain was instantly and massively depolarized within milliseconds of the initial surge of electricity. He suffered no conscious pain.
4. Consistent with recommendations of experts appointed by the Governor following Medina's execution, the Department of Corrections has now adopted as a matter of policy written "Testing Procedures for Electric Chair" and "Electrocution Day Procedures."
5. Florida's electric chairits apparatus, equipment, and electric circuitryis in excellent condition.
6. Florida's death chamber staff is qualified and competent to carry out executions.
7. All inmates who will hereafter be executed in Florida's electric chair will suffer no conscious pain.
The trial judge made the following conclusions of law:
1. Cruel or unusual punishment is defined by the Courts as the wanton infliction of unnecessary pain. Gregg v. Georgia, supra; Louisiana ex rel. Francis v. Resweber, supra.
2. Florida's electric chair, in past executions, did not wantonly inflict unnecessary *78 pain, and therefore, did not constitute cruel or unusual punishment.
3. Florida's electric chair, as it is to be employed in future executions pursuant to the Department of Corrections' written testing procedures and execution day procedures, will result in death without inflicting wanton and unnecessary pain, and therefore, will not constitute cruel or unusual punishment.
4. Florida's electric chair in its present condition does not constitute cruel or unusual punishment.
5. During the hearing it has been strongly suggested and inferred by Jones that Florida's electric chair as the method of judicial execution should be abandoned in favor of judicial execution by lethal injection. Such a move to adopt lethal injection is not within the constitutional prerogative of the Courts of this State, but rather lies solely within the prerogative of the Legislature of the State of Florida.
Jones's first point on appeal pertains to the testimony of State witness Dr. Michael Morse, who qualified as an expert in the field of electrical engineering with particular reference to the application of engineering science to the human body. In the first hearing, Morse testified that Medina had been rendered instantly unconscious and unable to feel pain. On cross-examination, he stated that he could not say with one hundred percent certainty how the electric current distributed itself during an execution. Pursuant to our order, the State arranged for Dr. Morse to be present at the second hearing so that Jones's counsel could further cross-examine him. During the second hearing, Jones's counsel announced that he did not need Dr. Morse present for further cross-examination. However, the State later called Morse to the stand and asked if he had done further research in trying to determine where the current goes when it leaves the headpiece. He said he had utilized a document prepared by Dr. John Wikswo and carried it forward to conclude that in his opinion somewhere between one-third and two-thirds of the current would flow to the brain during an execution in the electric chair. This testimony was apparently presented to rebut testimony from one of Jones's witnesses that a much smaller amount of current would pass directly to the brain during an execution. There was no objection to this testimony, and Morse was cross-examined on this and other matters. At the request of Jones's counsel the court asked Morse to retrieve the Wikswo article for Jones's counsel.
Morse furnished a copy of the article to Jones's counsel at the beginning of the hearing on the following morning, and the court released Morse from attendance so that he could remain in the courtroom if he wished. Later that morning, Jones's counsel filed a motion to strike Morse's testimony concerning current flow to the brain because the research on which it was based as well as the research contained in Wikswo's article was novel scientific evidence which had not been shown to have been accepted in the scientific community under the rationale of Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The trial judge denied the motion as being untimely since Dr. Morse had completed his testimony and been released as a witness before any objection was raised.
Jones argues that because Morse was still in attendance in the courtroom, the judge's ruling was in error. However, as in the case of other objections to expert testimony, a Frye objection is waived unless it is made at the time the testimony is offered. Jordan v. State, 694 So.2d 708 (Fla.1997); Hadden v. State, 690 So.2d 573 (Fla.1997). In any event, there is nothing in the findings of the judge's order which suggests that he relied on the disputed testimony. Moreover, that portion of Morse's testimony to which Jones objected was not probative of the issue this Court had directed the trial judge to decide, i.e., whether Florida's electric chair in its present condition constituted cruel or unusual punishment. We also reject Jones's second and corollary argument that the trial judge erred in refusing to grant a continuance so he would be able to present the testimony of Wikswo to demonstrate that Morse had misconstrued what he had said in his article.
*79 Jones states his third argument as follows: "Although the proper constitutional analysis holds that a deliberate indifference to a risk of pain renders a method of punishment cruel, Judge Soud erroneously required Mr. Jones to show that Medina and other judicial [sic] electrocuted persons experienced conscious pain." He cites Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), for the proposition that a state official's failure to prevent harm to prisoners constitutes cruel and unusual punishment if the official shows deliberate indifference to the prisoner's well-being.[2] He then jumps to the conclusion that the State of Florida has shown deliberate indifference through its executions. This contention is totally without merit. In order for a punishment to constitute cruel or unusual punishment, it must involve "torture or a lingering death" or the infliction of "unnecessary and wanton pain." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). As the Court observed in Resweber: "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." Id. at 464, 67 S.Ct. at 376. There was substantial evidence presented in this case that executions in Florida are conducted without any pain whatsoever, and this record is entirely devoid of evidence suggesting deliberate indifference to a prisoner's well-being on the part of state officials.
Jones also argues that the trial judge erred in refusing to admit and consider evidence that execution in Florida is unusual because there is a trend away from execution through the use of the electric chair as a means of capital punishment and because only six states currently employ the electric chair as a means of execution. The trial judge properly excluded this evidence as being beyond the scope of the issue which he had been assigned to decide. Our previous ruling that execution by the use of the electric chair is not per se unconstitutional subsumed the argument that Jones now makes.[3]See Campbell v. Wood, 18 F.3d 662, 682 (9th Cir.1994) ("We cannot conclude that judicial hanging is incompatible with evolving standards of decency simply because few states continue the practice."); Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir.1995) ("[T]he existence and adoption of more humane methods [of execution] does not automatically render a contested method cruel and unusual.").
In his fifth argument, Jones contends that Dr. Sperry was called as a witness by the State in violation of the attorney-client privilege.[4] As a consequence of the flame and smoke which accompanied Medina's execution, the State asked two doctors to conduct an autopsy. At the request of Jones, two doctors selected by his attorney were also permitted to participate in the autopsy. Dr. Sperry was one of the doctors selected by Jones's attorneys for this purpose. Following the autopsy, all four doctors jointly signed the autopsy report. At the second hearing, the State proposed to call Dr. Sperry as a witness. Jones objected on the grounds of attorney-client privilege. At the hearing on this motion, the judge heard testimony as to the nature of Dr. Sperry's employment by Jones's attorneys. The trial judge found no attorney-client relationship that would preclude the testimony of Dr. Sperry. The judge found that Dr. Sperry had received no instructions not to discuss his findings with other pathologists or the state attorneys. The judge also ruled that he would find that any privilege that might have existed had been waived under the circumstances *80 because Jones's attorneys did not object when Dr. Sperry answered questions and spoke at the meetings which took place before and after the autopsy at which Jones's lawyers attended.
In view of the judge's findings, which were supported by the record, we hold that no error occurred. Section 90.502, Florida Statutes (1995), pertaining to the lawyer-client privilege, protects confidential communications. The testimony by Dr. Sperry at the hearing did not pertain to communications with Jones's lawyers. We reject Jones's reliance on those cases which hold that a confidential mental health expert who is retained by defense counsel and who secures confidential information from the defendant cannot be called to testify by the State. E.g., Lovette v. State, 636 So.2d 1304 (Fla.1994). Dr. Sperry's testimony was limited to participation in the autopsy and his opinions concerning the effect of execution upon those being executed. See Rose v. State, 591 So.2d 195, 197-98 (Fla. 4th DCA 1991) (no error in permitting the medical examiner originally hired by the defense but not called as a witness to testify on behalf of the State where no confidential communications were passed between doctor and defendant's attorney).
In his sixth point on appeal, Jones attacks a number of evidentiary rulings made by the trial judge during the course of the hearing. None of these rulings individually or collectively were of such moment as to affect the outcome of this case and need not be discussed.
Finally, we reject Jones's contention that the trial judge's bias rendered him incapable of conducting a full and fair hearing.
There is competent substantial evidence in the record to support the order of the trial judge. We hold that electrocution in Florida's electric chair in its present condition is not cruel or unusual punishment. We hereby vacate Jones's stay of execution.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
HARDING, J., specially concurring with an opinion in which OVERTON, J., concurs.
KOGAN, C.J., dissents with an opinion in which SHAW and ANSTEAD, JJ., concur..
SHAW, J., dissents with an opinion in which KOGAN, C.J., and ANSTEAD, J., concur.
ANSTEAD, J., dissents with an opinion in which KOGAN, C.J., and SHAW, J., concur.
HARDING, Justice, specially concurring.
I concur with the majority that Florida's electric chair, in its current condition, does not violate either the United States Constitution's ban on cruel and unusual punishment or the Florida Constitution's ban on cruel or unusual punishment. I write separately to encourage the legislature to amend section 922.10, Florida Statutes (Supp.1996), to provide that a death sentence may be executed either by electrocution or by lethal injection. I believe that such an amendment would avert a possible constitutional "train wreck" if this or any other court should ever determine that electrocution is unconstitutional.
Prior to 1972, the United States Supreme Court had consistently held that the death penalty did not constitute cruel and unusual punishment.[5] However, in 1972, the United States Supreme Court concluded that the manner in which the death penalty was being imposed at the time did constitute cruel and unusual punishment. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Thus, Florida's death penalty statute was rendered unconstitutional. As a result, the forty death-row inmates who had been sentenced under that statute appealed their sentences. Anderson v. State, 267 So.2d 8 (Fla.1972).[6] This Court converted each of *81 the previous death sentences into life sentences. Justice Adkins, writing for the Court, noted that the Court had no other alternative as "[t]he only sentence which could now be imposed upon conviction of the crime of murder in the first degree is life imprisonment." Id. at 9.
While I do not predict such an event, I do have some concern that if execution by electrocution were ever declared unconstitutional by this or any other court, we might find ourselves in the same situation as the Anderson court. Section 775.082(1), Florida Statutes (1995), provides that a person convicted of a capital felony shall be punished either by death or life imprisonment. In turn, section 922.10 currently provides but one method by which a death sentence shall be executed: electrocution. Thus, our only alternative might be to impose life sentences on all inmates who have been sentenced to die by means of electrocution. No doubt, this result would be contrary to the intent of the people of Florida, who have determined through the legislature that the death penalty is an appropriate punishment for certain crimes. See § 775.082, Fla. Stat. (1995).
California has recently dealt with a similar situation. Prior to 1996, California's only means of execution was by lethal gas. This method was challenged in federal court as violative of the Eighth and Fourteenth Amendments. The United States Court of Appeals for the Ninth Circuit concluded that the gas chamber was violative of the ban on cruel and unusual punishment. Fierro v. Gomez, 77 F.3d 301 (9th Cir.1996). While that case was on appeal to the United States Supreme Court, the California Legislature responded by enacting California Penal Code Section 3604 (West 1996), which allows both current and future death-row inmates to choose the means by which death is to be administered, either lethal gas or lethal injection.[7] By the time Fierro reached the United States Supreme Court, the statute was already in effect. As a result, the United States Supreme Court vacated the judgment in Fierro and remanded the case back to the Ninth Circuit for further consideration in light of section 3604. Gomez v. Fierro,___ U.S. ___, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996). Thus, the United States Supreme Court has impliedly approved the course of action taken by the California Legislature.
Perhaps Florida's Legislature should consider a similar course of action.
OVERTON, J., concurs.
KOGAN, Chief Justice, dissenting.
I fully concur in Justice Shaw's dissenting opinion. I write to add that I find the Florida Corrections Commission's analysis of the electric chair compelling. The Florida Corrections Commission is the body responsible for analyzing the status of the state correctional system and recommending improvements therein to the Governor and Legislature. *82 § 20.315(4)(b)2, Fla. Stat. (1995). After Tafero's and Medina's executions, the Commission instructed its staff to conduct a survey of the execution methods used by other states. The results of that extensive survey and the Commission's recommendations are in the Commission's 1997 Supplemental Report on Execution Methods Used by States. In a letter to the Governor, the President of the Senate, and Speaker of the House, the Commission Chairman summarized the results of the Commission's survey and recommended that section 922.10, Florida Statutes (Supp.1996), be amended to phase out the electric chair as a means of execution in Florida. In its stead, the Commission recommended the use of lethal injection. Specifically the letter from the Commission Chairman states:
Surveyed states were asked to describe their execution procedures; composition of the execution team, including any medical personnel; problems encountered during execution; and, any documented costs of execution equipment. If a state had recently changed to lethal injection, they were asked what prompted the change, what method was previously used, and any legal ramifications of the change in methods.
We found that almost all states have written procedures regarding the execution process, and that numerous states had recently changed to lethal injection from electrocution because it was considered to be a "more humane method of execution." While the report notes problems encountered in the past with al most all methods of execution, including lethal injection, the Com mission recommends that Section 922.10, Florida Statutes, be amended to allow lethal injection as an alternative method of execution, in addition to electrocution, for those persons currently on a sentence of death. Furthermore, for persons whose crimes are committed on or after the effective date of such legislation, lethal injection would be the only method of execution thereby "phasing out" the use of the electric chair in Florida.
The Florida Corrections Commission believes that Florida has an obligation to ensure that modern technologies keep pace with the level of competence in this area, and, just as changes have occurred in Florida's past in carrying out the death penalty, changes should again occur.
I encourage the Legislature to carefully consider the findings and recommendations of the Florida Corrections Commission.
SHAW and ANSTEAD, JJ., concur.
SHAW, Justice, dissenting.
Florida's electric chair was commissioned by the legislature in 1923 as a humane alternative to hanging,[8] and legend has it that the chair, which was built the next year and nicknamed "Old Sparky," was a home-made affair,[9] fashioned by inmates on-site from a single oak tree.[10] Because of the spate of malfunctions in this jerry-built[11] and now-dated chair, I find that execution by electrocution *83 as currently practiced in this state no longer serves a humane purpose and in fact violates the prohibition against "cruel or unusual" punishment contained in the Florida Constitution.

I. CRUEL OR UNUSUAL PUNISHMENT
The people of Florida, through the legislature, have designated the death penalty as an appropriate punishment for certain crimes, see § 775.082, Fla. Stat. (1995), and with this I have no quarrelthe people of Florida have spoken, and I have sworn to uphold the law. To survive constitutional review, however, a method of execution must conform with both the state and federal constitutions, and I am similarly oath-bound to uphold the principles of these charters.
The United States Supreme Court has not reviewed a method of execution under the federal constitution in over a hundred years[12] and the lower federal courts are in disaccord in this area, offering scant guidance to the states.[13] When determining matters of basic rights, Florida courts are bound under federalist principles to look first to our state constitution:
When called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein.
Traylor v. State, 596 So.2d 957, 962 (Fla. 1992). If a government practice fails under the Florida Constitution, no further analysis is necessary under the federal charter.
Article I, section 17, Florida Constitution, proscribes punishments that are "cruel or unusual":
SECTION 17. Excessive punishments.Excessive fines, cruel or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden.
Art. I, § 17, Fla. Const. While some degree of suffering is inherent in any method of execution, the "cruel or unusual" prohibition bars those methods that fall below the constitutional floor.[14] Justice Brennan addressed the comparable federal provision in Glass v. Louisiana, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985):
The Court has never accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life. Thus in explaining the obvious unconstitutionality of such ancient practices as disembowelling while alive, drawing and quartering, public dissection, burning alive at the stake, crucifixion, and breaking at the wheel, the Court has empha sized that the [cruel and unusual punishment provision] forbids "in human and barbarous" methods of execution that go at all beyond "the mere extinguishment of life" and cause "torture or a lingering death." It is beyond debate that the [cruel and unusual provision] proscribes all forms of "unnecessary cruelty" that cause gratuitous "terror, pain, or disgrace."
Id., 471 U.S. at 1084, 105 S.Ct. at 2162 (Brennan, J., dissenting) (citations and footnotes omitted).
Significantly, the framers of article I, section 17 of the Florida Constitution articulated the "cruel or unusual" prohibition in the alternative, and this Court has given the provision a literal interpretation: The State is for bidden from imposing punishments that are either cruel or unusual.[15] Further, the prohibition *84 contains no limiting language and, by its plain words, bars punishments that are cruel or unusual in any manner.[16] Thus, if the Florida prohibition is to have meaning, it must at a minimum bar any punishment that is impermissibly cruel either on its face or in its effect, as well as any punishment that is unusual. To comport with the Florida Constitution, a method of execution must meet these minimum criteria as explained below.[17]
To meet the requirement that a punishment not be cruel on its face, a method of execution should entail no unnecessary violence or mutilation:
The [federal prohibition against cruel and unusual punishment] extends beyond prohibiting the unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned. Similarly, basic notions of human dignity command that the State minimize "mutilation" and "distortion" of the condemned prisoner's body.
Glass, 471 U.S. at 1085, 105 S.Ct. at 2162-63 (Brennan, J., dissent ing). The guillotine is an example of a method that would fail under this prong, for while beheading results in a quick, relatively painless death,[18] it involves frank violence (i.e., gross laceration and blood-letting) and mutilation (i.e., decapitation) and thus is facially cruel.
Next, to meet the requirement that a punishment not be cruel in its effect, a method of execution should inflict no unnecessary pain.[19] As the United States Supreme Court stated: "The traditional humanity of modern An glo-American law forbids the infliction of unnecessary pain in the execution of the death sentence." Resweber, 329 U.S. at 463, 67 S.Ct. at 376.
The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment *85 shall be reduced, as nearly as possible, to no more than that of death it self.
Id. at 474, 67 S.Ct. at 381 (Burton, J., dissenting). California's gas chamber would fail here, for while lethal gas as applied in California involves minimal violence and mutilation, it inflicts substantial pain (i.e., intense visceral pain from oxygen deprivation) and results in a slow, lingering death akin to artificial drowning (i.e., the inmate may remain conscious for several minutes)[20] and thus is cruel in its effect. Execution by gas is to be distinguished from lethal injection, which is generally considered painless.[21]
Section 17 of the Florida Constitution also prohibits "unusual" punishments, and giving the word "unusual" its plain meaning,[22] I know of no better yardstick for measuring this criterion than to compare the method of punishment under review against those methods currently available in other states or Western nations.[23] While I would find lack of approval in a majority of jurisdictions a strong indicator that a method is impermissibly unusual, I recognize that this is not dispositive but rather is simply one factoralbeit a significant oneto be considered.

II. FLORIDA'S ELECTRIC CHAIR
While the people of Florida have designated capital punishment as an appropriate sanction for certain crimes, the legislature has implemented electrocution as the sole method of execution in this State. See § 922.10, Fla. Stat. (Supp.1996). In light of recent malfunctions in Florida's electric chair, this method of execution, in my opinion, entails unnecessary violence and mutilation and thus is unconstitutionally cruel on its facenot unlike the guillotine which was abandoned years ago in its country of origin, France, notwithstanding its efficiency in getting the grisly job done with dispatch and minimal pain.[24]
This Court described the circumstances surrounding the execution of Jesse Tafero, which took place May 4, 1990:
When Tafero's execution began, smoke and flames instantaneously spurted from his head for a distance of as much as twelve inches. The flames and smoke emanated from the area around a metallic skull cap, inside of which was a saline-soaked synthetic sponge meant to increase the flow of electricity to the head. The cap is the source of electricity administered to condemned prisoners by the electric chair.
Because of the smoke and flames, officials of the Department of Corrections stopped the first surge of electricity. A second jolt again resulted in smoke and flames spurting from Tafero's head. Finally, a third jolt of electricity was administered. A medical examiner found that *86 Tafero was dead some six or seven minutes after the execution commenced.
Thereafter, the Governor ordered the Department of Corrections to conduct an investigation into the circumstances of Tafero's execution. The Department reported that the equipment was in proper working order. However, it was determined that for the first time a synthetic, rather than a natural, sponge had been used in the headpiece. The Department concluded that the burning of the sponge caused the flames and smoke which were seen during Tafero's execution.... The Department ... noted that most executions last longer than seven minutes.
Buenoano v. State, 565 So.2d 309, 310-11 (Fla.1990). The condition of Tafero's body was described in the sworn statement of a witness:
I have seen the bodies of three other inmates executed by officials of the Florida State Prison. I saw them at approximately the same length of time after they were executed as I saw Mr. Tafero's body. None of the other bodies I saw before had the severe burning and scorching and damage to the head as did Mr. Tafero's. None had any marks on the face at all.
The entire top of Mr. Tafero's head is covered with wounds. There is one dominant charred area and a myriad of smaller gouged, raw areas to the upper right side and lower right of the large burned area.
The dominant charred area is on the top leftside of the head. It is larger than my hand.... The funeral director said that this was a third degree burn. The rest of that area was a dark brownish color, slightly lighter than the charred area. The funeral director said that this would be a second degree burn.
Id. at 314 (Kogan, J., dissenting).
The execution of Pedro Medina on March 25, 1997, was a reprise of the Tafero execution. In the words of the trial court below:
When Pedro Medina was executed on March 25, 1997, the following events occurred. When the electrical current was activated, within seconds ... smoke emanated from under the right side of Medina's head piece, followed by a 4 to 5 inch yellow-orange flame which lasted 4 to 5 seconds and then disappeared. After the flame went out, more smoke emanated from under the head piece to the extent that the death chamber was filled with smokebut the smoke was not dense enough to impair visibility in or through the chamber. The smoke continued until the electrical current was shut off in the middle of the third cycle. Although several witnesses to the execution tried to describe the odor of the smoke, only one witness, Florida State Prison Superintendent Ronald McAndrews, described the odor as burnt sponge.... This Court finds that the odor smelled was burnt sponge, not burnt flesh.
The physician's assistant, William Mathews, examined Medina's body. At that time, Medina was not breathing or exchanging air through his nostrils; his pupils were fixed and dilated; and he had an agonal pulse and heart sounds. When the physician's assistant was no longer able to detect any pulse or heart sounds, the attending physician, Dr. Almojera, examined Medina and pronounced him dead at 7:10 a.m. During Dr. Almojera's last examination Medina's chest was seen to move two or three times in a two to four minute period. A couple of witnesses thought Medina was trying to breathe. Several witnesses did not describe it as attempted breathing, but as a lurching, spasmodic movement, a shudder, and outward not upward movement. No witness, particularly those closest to Medina, could state that he was in fact breathing or attempting to breathe.
The trial court summarized the findings of the pathologists who conducted the autopsy of Medina:
1. The head had a "burn ring" on the crown of the head that was common in executions by judicial electrocution.
2. Within the "burn ring" there was a third degree burn on the crown of the head, with deposits of charred material....
3. There was a first degree burn of the upper front face and head, caused by *87 scalding steam.... Unlike the Tafero execution, Medina had no burning of the eyebrows, eyelashes, or small hairs of the face that would have resulted if the burning had been the result of a flame rather than steam.
The State points out that during the intervening years between the Tafero and Medina executions, sixteen prisoners were executed without incident. This record in my opinion is inadequate to save Florida's electric chair from the constitutional dustheap. The bottom line is inexorable: In two out of eighteen executions, i.e., in eleven percent of executions, carried out during this relatively brief period, the condemned prisoner was engulfed in smoke, flames, and the odor of burning materialwhich some observers described as the stench of burning or roasting flesh when the switch was pulled. The head of one prisoner (Tafero) was burned and charred, his face was seared by flames, and his eyebrows, eyelashes, and facial hair were burned. The head of another (Medina) was burned and charred and his face was scalded. These deaths were sufficiently egregious to halt further executions and to prompt an extensive official inquiry. They also created a media circus and raucous public spectaclejust like in days of yore.

III. CONCLUSION
The execution of a condemned man or woman is an extraordinarily solemn undertaking reluctantly assumed by the State at the behest of the peopleno task is more somber or weighty for the State than the purposeful killing of one of its own. It is no circus. The constitutional tolerance for error in an execution is not boundless, for the Florida Constitution embodies all that is good and decent in the law and has no truck with the wanton infliction of violence or mutilation or pain that characterized executions in ages pastwhether inherent in the method of execution or arising from "human error" or from simple indifference.
Execution by electrocution is a spectacle whose time has passedlike the guillotine or public stoning or burning at the stake. Deborah Denno[25] and other experts have submitted sworn affidavits attesting to the following statistics concerning electrocution: Electrocution was first adopted by a state as a method of execution in 1888 and last adopted in 1949, at which time twenty-six states used it; since 1949 (i.e., almost half a century ago), no state has adopted electrocution and twenty states have dropped it; of thirty-eight states that currently authorize execution, only six (Alabama, Florida, Georgia, Kentucky, Nebraska, and Tennessee) require electrocution; of these six, two (Kentucky and Tennessee) have not executed any prisoners since the United States Supreme Court lifted its ban on capital punishment in 1976; four additional states (Arkansas, Ohio, South Carolina, and Virginia) offer electrocution as an option; of these four, one (Ohio) has not executed any prisoners since 1976; of approximately 140 countries outside the United States that impose capital punishment, none impose electrocution; in short, only four governments in the entire world (Alabama, Florida, Georgia, and Nebraska) impose electrocution exclusively; as a postscriptboth the Humane Society of the United States and the American Veterinarian Medical Association condemn electrocution as a method of euthanasia for animals.[26]
Florida's electric chair, by its own track record, has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of Florida State Prison. Because electrocution is the sole means of execution approved for use in Florida, the legislature has, so to speak, placed all its constitutional eggs in this one basket. As a result, any infirmity in this method cannot be mitigated at this time by the presence of an acceptable alternative. Such an all-or-nothing approach has proved *88 fatal to the capital sentencing scheme in other states.[27]
In sum, while the people of Florida have determined that capital punishment is a proper sanction for certain crimes, the legislature has authorized a single method of execution and this method has resulted in botched executions in eleven percent of cases in recent yearsproducing impermissible violence and mutilation. This, in my opinion, puts the burden back on the legislature to implement an alternative methodone that comports with the Florida Constitution. While the Florida Constitution does notby any meansguarantee that no inmate executed in Florida will suffer, it does guarantee that none will be needlessly brutalized or mutilated.
KOGAN, C.J., and ANSTEAD, J., concur.
ANSTEAD, Justice, dissenting.
Unfortunately, the outcome in this case was essentially determined months ago when a majority of this Court refused to permit a full hearing in the trial court on the issue of the constitutionality of electrocution as a means of execution under contemporary circumstances. Instead, the majority opted to limit any inquiry to the question of whether state officials could avoid a repeat of the botched Pedro Medina execution, an issue that serves as only a small part of the larger constitutional puzzle as to the continuing constitutional validity of electrocution. That limitation on the trial court hearing virtually assured the outcome announced by the majority today.
The essential test for determining whether a form of punishment is "cruel and unusual" is whether it involves the unnecessary infliction of pain or is inconsistent with society's evolving standards of decency. See Hudson v. McMillian, 503 U.S. 1, 10, 112 S.Ct. 995, 1000-1001, 117 L.Ed.2d 156 (1992) (citing Estelle v. Gamble, 429 U.S. 97, 102-03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). Florida's constitution explicitly bars cruel or unusual punishments. Fortunately, as thoroughly demonstrated in the opinions of Chief Justice Kogan and Justice Shaw, the essential information necessary to evaluate the current constitutionality of electrocution under these standards is available in the extensive written authorities cited to the Court and the record herein.
As Justice Shaw demonstrates, the constitutional limitation upon the infliction of pain concerns the infliction of unnecessary pain, especially considered in light of the availability of more humane methods of execution. On this issue it is apparent that the overwhelming majority of jurisdictions that initially chose electrocution have since abandoned its use, principally because a more humane method of execution was readily available. It is ironic that 19th century policy makers in New York adopted electrocution as a more humane method of execution based upon the state of knowledge then existing. Over a hundred years later the essential question now presented is whether electrocution should be abandoned in favor of a more humane method. The report of the Florida Corrections Commission, in fact, recommends the adoption of lethal injection as a demonstrated more humane method of execution.
Further, in assessing the cruelty of electrocutions, it must be noted that all electrocutions, not just the botched executions of Tafero and Medina, involve destruction and mutilation of the human body in the form of extreme burning. In fact, as Justice Shaw notes, we are doing to human inmates today what we would not do, for humane reasons, to animals. It should also not be overlooked that there have been numerous botched electrocutions documented in other states besides Florida. However, even if we only consider recent electrocutions in Florida, it is apparent, as Justice Shaw has demonstrated, *89 that there is a significant risk of the infliction of unnecessary pain, both mental and physical, in the electrocution process and culture in Florida. To be sure, the petitioner proffered evidence in the trial court that some government officials maintain that pain is a necessary part of the process.
As to the "unusual" part of the federal and state constitutional limitations, Justice Shaw has correctly noted that electrocution is, in fact, "unusual" since only a few jurisdictions in the entire world use electrocution. Considered from another angle, it is also apparent that the drafters of the "cruel and unusual" and "cruel or unusual" provisions in our federal and state constitutions, would not only have found the electric chair unusual because of its later invention, but also because it obviously fits within the "rack and screw" type of punishment device identified more with the dark ages and horror stories than with a civilized society approaching the 21st century.
Finally, of course, it is worth acknowledging in a positive way that, indeed, almost every jurisdiction that once embraced the electric chair has since abandoned it, and there is every reason to believe, as evidenced by the work of the Corrections Commission, that this tiny step to advance civilization will also be taken in Florida. Surely, our evolving standards of decency should compel us to join with those states that have rejected the use of the now antiquated electric chair.
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] During Medina's execution, flames were seen near the headpiece of the electric chair and smoke emanated from under the headpiece.
[2] The Farmer opinion also points out that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.
[3] In Pedro Medina's case, we made a similar ruling that execution by electrocution is not per se cruel or unusual punishment. See Medina v. State, 690 So.2d 1241 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 1330, 137 L.Ed.2d 490 (1997). In fact, we know of no court in the nation which has ever held that execution by electrocution is cruel and unusual punishment.
[4] Prior to the second hearing, Jones filed a petition for extraordinary relief, for writ of prohibition and/or for writ of mandamus, seeking to prevent the State from calling Dr. Sperry to testify. We denied the petition.
[5] See, e.g., Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (holding that the carrying out of an execution after the first execution attempt had failed did not amount to cruel and unusual punishment); In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890) ("[T]he punishment of death is not cruel within the meaning of that word as used in the constitution.").
[6] Anderson v. State, 267 So.2d 8 (Fla.1972), actually was before the Court on the motion of the Attorney General and counsel for the forty death-row inmates. The motion asked this Court to relinquish jurisdiction and remand the forty cases to the respective circuit courts for imposition of life sentences. Id. at 9. This Court imposed automatic life sentences on the inmates that had been convicted of first-degree murder "rather than proceed through the ministerial formality of imposition of such an automatic sentence by the trial court." Id. at 10.
[7] California Penal Code Section 3604 (West 1996), provides:

(a) The punishment of death shall be inflicted by the administration of a lethal gas or by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections.
(b) Persons sentenced to death prior to or after the operative date of this subdivision shall have the opportunity to elect to have the punishment imposed by lethal gas or lethal injection. This choice shall be made in writing and shall be submitted to the warden pursuant to regulations established by the Department of Corrections. If a person under sentence of death does not choose either lethal gas or lethal injection within 10 days after the warden's service upon the inmate of an execution warrant issued following the operative date of this subdivision, the penalty of death shall be imposed by lethal injection.
(c) Where the person sentenced to death is not executed on the date set for execution and a new execution date is subsequently set, the inmate again shall have the opportunity to elect to have punishment imposed by lethal gas or lethal injection, according to the procedures set forth in subdivision (b).
(d) Notwithstanding subdivision (b), if either manner of execution described in subdivision (a) is held invalid, the punishment of death shall be imposed by the alternative means specified in subdivision (a).
[8] See ch. 9169, § 2 at 175, Laws of Fla. (1923) ("On and after January 1st, A.D.1924, death by hanging as a means of punishment for crime in Florida is hereby abolished and electrocution, or death by electricity substituted therefor.")
[9] See, e.g., Buenoano v. State, 565 So.2d 309, 315 (Fla.1990) (Kogan, J., dissenting):

This statement [concerning the makeshift nature of the chair] was confirmed by the man who actually fabricated the Army-boot electrode, Robin Adair. Adair stated that, while working at the prison, he created the present Army-boot electrode by riveting different types of metal and roofing material into the boot, together with a stainless steel bolt obtained from a hardware store. Adair specifically characterized this arrangement as "homemade."
[10] See generally Ken Driggs, A Current of Electricity Sufficient in Intensity to Cause Immediate Death: A Pre-Furman History of Florida's Electric Chair, 22 Stetson L.Rev. 1169 (1993).
[11] See, e.g., Buenoano, 565 So.2d at 315 (Kogan, J., dissenting):

An expert in the design and construction of electric chairs, Fred Leuchter, Jr., reported that the Florida chair was not functioning properly because of its use of only a single "homemade" leg electrode. According to Leuchter, an electric chair needs electrodes attached to both legs in order to work properly. Leuchter also criticized the present leg electrode because it had been haphazardly constructed from an old Army boot and other spare parts.
[12] See In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890) (addressing electrocution as a method of execution); Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878) (addressing shooting as a method of execution).
[13] See infra note 17.
[14] See generally Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947) ("The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely.").
[15] See Allen v. State, 636 So.2d 494, 497 n. 5 (Fla.1994) ("Unlike the federal Constitution, the Florida Constitution prohibits `cruel or unusual punishment.' Art. I, § 17, Fla. Const. This means that alternatives were intended."). See also Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla.1991) ("The use of the word `or' indicates that alternatives were intended.").
[16] See Art. I, § 17, Fla. Const. ("[C]ruel or unusual punishment[s] ... are forbidden.").
[17] The federal criteria, by comparison, vary. The United States Supreme Court has analyzed a number of government practices under the federal "cruel and unusual" provision, including the imposition of death on special groups of defendants, see, e.g., Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that it is not cruel and unusual to execute the mentally retarded); Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding that it is cruel and unusual to execute the insane); the imposition of death for crimes other than murder, see, e.g., Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding the death penalty disproportionately cruel and unusual when imposed for aiding and abetting a robbery resulting in murder); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding the death penalty disproportionately cruel and unusual when imposed for the crime of rape); and the denial of basic rights to prisoners, see, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that deliberate indifference to prisoners' medical needs is cruel and unusual punishment). The federal Court, however, has not reviewed a "method of execution" case in over a hundred years. See In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 933-34, 34 L.Ed. 519 (1890) (allowing New York's never-before-used method of execution, electrocution, to stand). Thus, no recent controlling federal precedent exists. To fill this void, some lower federal courts have attempted to superimpose analytical models from the above lines of cases (such as the "evolving standards of decency" analysis from the "proportionality" cases) upon the "method of execution" cases, but other courts have eschewed such efforts. See, e.g., Campbell v. Wood, 18 F.3d 662 (9th Cir.1994) (en banc) (majority and dissenting opinions).
[18] See generally Robert J. Sech, Note, Hang `Em High: A Proposal for Thoroughly Evaluating the Constitutionality of Execution Methods, 30 Val. U.L.Rev. 381 (1995).
[19] This determination should be made in light of "presently available alternatives," as Justice Powell noted in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972):

Neither the Congress nor any state legislature would today tolerate pillorying, branding, or cropping or nailing of the earspunishments that were in existence during our colonial era. Should, however, any such punishment be prescribed, the courts would certainly enjoin its execution. Likewise, no court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives.
Id., 408 U.S. at 430, 92 S.Ct. at 2824 (Powell, J., dissenting) (citation and footnote omitted) (emphasis added). Justice Powell's views in Furman were largely adopted by the Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[20] The United States Court of Appeals, Ninth Circuit, described the effects of lethal gas:

[I]nmates who are put to death in the gas chamber at San Quentin do not become immediately unconscious upon the first breath of lethal gas.... [A]n inmate probably remains conscious anywhere from 15 seconds to one minute, and ... there is a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes. During this time, ... inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells. The experience of "air hunger" is akin to the experience of a major heart attack, or to being held under water. Other possible effects of the cyanide gas include tetany, an exquisitely painful contraction of the muscles, and painful build-up of lactic acid and adrenaline. Cyanide-induced cellular suffocation causes anxiety, panic, terror, and pain.
Fierro v. Gomez, 77 F.3d 301, 308 (9th Cir.)(quoting Fierro v. Gomez, 865 F.Supp. 1387, 1404 (N.D.Cal.1994)), vacated and remanded for reconsideration, ___ U.S. ___, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996).
[21] See generally Kristina E. Beard, Comment, Five Under the Eighth: Methodology Review and the Cruel and Unusual Punishments Clause, 51 U. Miami L.Rev. 445, 465 (1997) ("By most accounts, lethal injection involves minimal pain, and there is little apparent violence or bodily mutilation.").
[22] See Webster's Third New International Dictionary 2514 (4th ed.1976) (defining "unusual" as: "being out of the ordinary ... deviating from the normal ... being unlike others").
[23] See infra p. 87 for a comparative analysis of the use of electrocution in other states and nations.
[24] See generally Sech, supra note 18.
[25] Denno is author of an exhaustive study of execution by electrocution. See Deborah W. Denno, Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century 35 Wm. & Mary L.Rev. 551 (1994).
[26] See Denno Aff., Petitioner's Appendix, § 7; Dieter Decl., Petitioner's Appendix, § 8; "Statutory Evidence of Legislative Changes in Execution Methods," Petitioner's Appendix, § 17.
[27] Compare Fierro v. Gomez, 77 F.3d 301 (9th Cir.1996) (holding California's sole method of execution, lethal gas, unconstitutional under the federal cruel and unusual provision); with Campbell v. Wood, 18 F.3d 662 (9th Cir.1994) (holding the State of Washington's alternative method of execution, hanging, constitutional under the same provision). In point of fact, the United States Supreme Court vacated Fierro and remanded the case for reconsideration after the California Legislature adopted lethal injection as an alternative to gas. Gomez v. Fierro, ___ U.S. ___, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996).