969 So.2d 326 (2007)
Ian Deco LIGHTBOURNE, Petitioner,
v.
Bill McCOLLUM, etc., et al., Respondents.
No. SC06-2391.
Supreme Court of Florida.
November 1, 2007.
Rehearing Denied November 7, 2007.
*328 Neal A. Dupree, Capital Collateral Regional Counsel, Suzanne Myers Keffer, Roseanne Eckert, Assistant CCRC and Anna-Liisa Nixon, CCRC Staff Attorney, Southern Region, Fort Lauderdale, Florida, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, Florida, Carolyn M. Snurkowski, Assistant Deputy Attorney General, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, Florida, for Respondent.
PER CURIAM.
This case is before the Court on the all writs petition of Ian Deco Lightbourne, challenging Florida's lethal injection procedures after complications occurred in the administration of chemicals during the execution of Angel Diaz on December 13, 2006.[1] The main issue in this case is whether Florida's current lethal injection procedures violate the Eighth Amendment to the United States Constitution.[2]

FACTUAL AND PROCEDURAL BACKGROUND
On December 13, 2006, Angel Diaz was executed by lethal injection, but his execution *329 "took 34 minutes, which was substantially longer than in any previous lethal injection in Florida."[3] The day after Diaz's execution, Lightbourne and other death row inmates filed the instant emergency all writs petition, requesting that this Court: (1) address whether Florida's lethal injection procedures violate the Eighth Amendment; (2) enjoin Diaz's autopsy and order that the autopsy be conducted by an independent medical examiner or with petitioners' independent expert present; (3) order the production of all records previously requested by Lightbourne; and (4) appoint a special master to hear and receive evidence regarding the pain suffered during lethal injection.
On December 14, 2006, this Court entered an order allowing Lightbourne to designate a representative to attend the Diaz autopsy and relinquishing jurisdiction to the circuit court for an immediate determination of Lightbourne's request for an independent autopsy and "all other issues raised" by Lightbourne. By our order of December 14, 2006, we essentially ruled on two of Lightbourne's requests in his petition, first by addressing the issue of the autopsy and then by relinquishing to the trial court to decide the issues that required factual development. On February 9, 2007, the Court dismissed without prejudice all petitioners' claims in Case No. SC06-2391 other than Lightbourne's.
At the time that the emergency all writs petition was filed in this case, Lightbourne had another appeal pending before this Court which challenged the constitutionality of the lethal injection statute and procedures and raised a public records issue. See Lightbourne v. State, 956 So.2d 456 (Fla.2007) (SC06-1241) (unpublished decision affirming the denial of his successive motion for postconviction relief). In affirming the denial, this Court stated by order:
[A]s a result of Angel Diaz's execution by lethal injection, a series of events occurred that the trial court could not have considered in denying Lightbourne's motion. The impact of those events on the issue of the constitutionality of Florida's lethal injection procedures is currently being litigated in Lightbourne v. McCollum, SC06-2391. Accordingly, we conclude that the better course is to allow that case to proceed, in which Lightbourne has reasserted his public records request and in which an evidentiary hearing will be held in May 2007.
Lightbourne v. State, No. SC06-1241, 956 So.2d 456 (Fla. Apr. 16, 2007) (unpublished order).
At the same time that Lightbourne has been pursuing relief in this Court, the executive branch has also responded to the Diaz execution, working expeditiously on a parallel track with the goal of addressing issues regarding Florida's lethal injection procedures. We briefly detail the executive branch's efforts because its response to the Diaz execution and the revisions to the protocol affect our ultimate determination of the constitutionality of the current lethal injection procedures.
Shortly after the Diaz execution, on December 15, 2006, then-Governor Bush stayed all executions and issued an executive order creating a Governor's Commission *330 on Administration of Lethal Injection to "review the method in which the lethal injection procedures are administered by the Department of Corrections and to make findings and recommendations as to how administration of the procedures and protocols can be revised." The Commission held hearings over four days and submitted a final report to the Governor on March 1, 2007. After noting that Diaz's execution "called into question the adequacy of the lethal injection protocols," the Commission found that during the execution of Angel Diaz, the Department of Corrections ("DOC") and the execution team failed to follow its protocols, failed to ensure successful intravenous ("IV") access, failed to provide adequate training, and failed to have guidelines in place for handling complications. Governor's Commission Report at 2, 8-9. Based on conflicting expert medical opinions and witnesses' observations of the inmate, the Commission was unable to reach a conclusion as to whether inmate Angel Diaz was in pain during the execution. Even though the Commission found these numerous failures during the Diaz execution, it opined that an agency following procedures framed in its recommendations could carry out an execution in a constitutional manner using the current three-chemical combination. The Commission provided detailed recommendations regarding how the DOC should modify its protocols and practices.
DOC Secretary James McDonough also responded to the Diaz execution by creating an initial task force to collect information as to what occurred during the Diaz execution. Subsequent to the Governor's Commission's report, Secretary McDonough established another task force to recommend modifications to the existing lethal injection protocols in accord with the findings and recommendations previously made, including planned renovations to the execution facility. As a result of the findings of the DOC task force and the findings and recommendations of the Governor's Commission, the DOC revised its lethal injection procedures, effective May 9, 2007.
Although this Court relinquished jurisdiction in the Lightbourne proceedings in December 2006, the trial court appropriately waited until after the Governor's Commission studied the matter and issued its report before it held evidentiary hearings on the claims raised. The evidentiary hearings lasted thirteen days, and approximately forty witnesses testified, resulting in a record exceeding 6,500 pages. The testimony and evidence focused on three main topics: (1) whether Diaz suffered pain during his execution; (2) what deficiencies existed in the lethal injection procedures and how those alleged deficiencies contributed to the complications; and (3) whether the risk of pain in future executions had been sufficiently minimized by changes made to the protocol as a result of the Diaz execution.
On July 22, 2007, the trial court verbally issued a temporary stay of any death warrant for Lightbourne and ordered the State to revise its lethal injection procedures in accord with the DOC's testimony about anticipated revisions to the protocol and the trial court's comments. The trial court expressed its concerns regarding the qualifications, training, licensure, and credentials for members of the execution team. The trial court commented on the need for training for contingencies, as well as the need for creating checklists, providing for periodic review of DOC procedures, providing for certification of readiness by the DOC to carry out an execution according to the protocol, and providing clear directions that any observed problems or deviations from the protocols should be *331 immediately brought to the attention of the warden.
The DOC again revised its lethal injection procedures in response to the trial court's comments and in line with its anticipated revisions, submitting its revised procedures (the "August 2007 procedures") which provided more detail as to the qualifications of the execution team members, more clarification that the warden is to ensure that the team members are properly trained, and procedures that require the team members to report any problems or concerns to the warden. After this revision, the parties were allowed to present additional evidence to the trial court.
On September 10, 2007, the trial court entered a final order, which denied the relief sought by Lightbourne, lifted the temporary stay of execution, and found that the August 2007 lethal injection procedures were not unconstitutional. The trial court found that the DOC addressed the irregularities that occurred in the Diaz execution and had taken appropriate action in the revised protocol to reduce the risk of similar irregularities happening in the future. The trial court found that when properly injected, the three-drug protocol used by the State will produce a sequence of unconsciousness, cessation of all muscular function, and cessation of heart function, resulting in death. The trial court also found that Diaz's execution took longer than expected because the drugs were injected subcutaneously, rather than delivered intravenously as intended, because the needles penetrated through the veins in both arms. The trial court concluded that the lethal injection procedures now in place in Florida do not violate the constitutional prohibition against cruel and unusual punishment.
Lightbourne appeals to this Court raising three issues: (1) whether he was denied a full and fair hearing in violation of his constitutional right to due process; (2) whether the lower court erred in refusing to consider certain memoranda on the grounds that they fall under the definition of attorney work-product and are thus protected by the lawyer-client privilege; and (3) whether Florida's lethal injection procedures violate the Eighth Amendment. We treat these claims in the order in which they were presented.

DENIAL OF A FULL AND FAIR HEARING
In his first issue on appeal, Lightbourne alleges that he was denied a full and fair hearing for several reasons, including the time limits imposed by this Court and the trial court as well as his inability to present certain evidence after the DOC revised the protocol in August 2007. He also complains about his counsel not being able to observe a "walk through" lethal injection training session conducted in the actual death chamber. We conclude that none of these issues individually or collectively denied Lightbourne a full and fair hearing or prevented this Court from obtaining a complete picture of the issues raised by Lightbourne regarding his lethal injection claim and any alleged deficiencies.
The bottom line, despite numerous complaints raised by Lightbourne, is that Lightbourne was given ample opportunity over four months, with thirteen days of hearings and voluminous documentary evidence, to present his own witnesses and to cross-examine the witnesses presented by the State concerning both the Diaz execution and the revised lethal injection procedures. While this Court's interest is in the quality rather than the quantity of the testimony presented, the evidentiary hearing was quite extensive. Even after the lethal injection procedures were revised, Lightbourne was given the further opportunity *332 to visit the death chamber and to present additional testimony, including the affidavit of his expert who had already testified and which affidavit was accepted as if he had testified in person.
We further conclude that the trial court spent considerable time addressing the issue of public records and that no abuse of discretion occurred in any of its rulings. See Rodriguez v. State, 919 So.2d 1252, 1272-74 (Fla.2005); Provenzano v. Moore, 744 So.2d 413, 415 (Fla.1999). In conclusion, we reject Lightbourne's claim, based on the specific assertions in his brief, that he was denied a full and fair hearing in the proceedings below as a result of the manner in which the trial court conducted the evidentiary hearing and its rulings on evidentiary matters. Cf. Sims v. State, 754 So.2d 657, 665-66 (Fla.2000) (rejecting similar claim).

THE "DYEHOUSE" MEMORANDA
Lightbourne next claims error in the trial court's exclusion of two memoranda, dated June 16, 2006, and August 15, 2006, and prepared by Sara Dyehouse, an assistant general counsel for the Department of Corrections. The trial court concluded these memoranda both constituted work product and were protected by attorney-client privilege. In this case, the memoranda were actually provided to Lightbourne in August 2007 as part of a public records request. After producing the memoranda, the State belatedly filed a motion for protective order, arguing that the memoranda were protected by work-product and attorney-client privilege. The memoranda were transmitted to this Court under seal, although they also appear in a separate portion of the record on appeal that is not under seal.
Chapter 119, Florida Statutes, makes broad provision for agency records to be made available to the public. The exemption that is provided by statute is set forth in section 119.071(1)(d)1, Florida Statutes (2006), which provides:
A public record that was prepared by an agency (including an attorney employed or retained by the agency or employed or retained by another public officer or agency to protect or represent the interests of the agency having custody of the record) or prepared at the attorney's express direction, that reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the agency, and that was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or that was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceedings, is exempt from s. 119.07(1) and s. 24(a), Art. I of the State constitution until the conclusion of the litigation or adversarial administrative proceedings. For purposes of capital collateral litigation as set forth in s. 27.7001, the Attorney General's office is entitled to claim this exemption for those public records prepared for direct appeal as well as for all capital collateral litigation after direct appeal until execution of sentence or imposition of a life sentence.
Therefore, the exemption only extends to those records that contain the attorney's mental impressions, litigation strategy, or legal theory and are prepared exclusively for litigation or in anticipation of imminent litigation. Importantly, any exemption under this section exists only until the conclusion of the litigation or, in the case of public records prepared for an appeal or postconviction proceedings, only until the execution of the sentence.
The public records act "is to be construed liberally in favor of openness, and all exemptions from disclosure are to *333 be construed narrowly and limited in their designated purpose." City of Riviera Beach v. Barfield, 642 So.2d 1135, 1136 (Fla. 4th DCA 1994). Under section 119.071, the State has the burden of showing that the Dyehouse memoranda fall within the statutory requirements. The State asserts the memoranda were prepared for or in anticipation of litigation because lethal injection litigation is and has been ongoing in Florida since January of 2006. The State also contends that the memoranda were prepared for litigation because they were prepared for use in litigation concerning imminent executions, citing the cases of Clarence Hill and Arthur Rutherford. When the State asserted privilege based on these cases, however, the litigation in these cases was concluded, and these defendants had been executed.[4] The State appears to be contending that it is entitled to a continuing exemption as to these memoranda because lethal injection litigation is ongoing. We reject this contention.
Further, neither memorandum on its face relates to any pending litigation or appears to have been prepared "exclusively for litigation." The first memorandum, dated June 16, 2006, relates generally to the lethal injection procedures and describes the process by which the chemicals were administered at that time. The second memorandum, dated August 15, 2006, relates to the possible use of a "bispectral index monitor" (BIS monitor) to assess the inmate's level of consciousness during an execution.
Although the two memoranda were prepared by a DOC attorney, each memorandum appears to be final in form and conveyed specific factual information rather than mental impressions or litigation strategies.[5] Accordingly, we conclude that the trial court erred in excluding these memoranda on the basis of either work-product or attorney-client privilege.
Even if the memoranda were otherwise exempt under chapter 119, Lightbourne contends that any privilege that might have existed was waived by actions of the Department of Corrections and the State. The State produced the memoranda to Lightbourne's counsel as part of a public records response. The State also filed copies of the memoranda in the court file along with other public records submitted on August 7. The State confirmed on the record with the trial court that the memoranda had been filed in at least one other postconviction proceeding.
The State contends, however, that the privilege should apply because the disclosure was inadvertent. Although some courts have held that any disclosure waives the privilege, others have applied a "relevant circumstances" test which looks at various factors to determine if inadvertent disclosure should constitute a waiver. See Abamar Hous. & Dev., Inc. v. Lisa Daly Lady Decor, Inc., 698 So.2d 276, 278 (Fla. 3d DCA 1997).[6] Nothing in the record *334 supports the State's contention that reasonable precautions were taken to prevent the release of the memoranda or that the interests of justice would be served by suppressing these documents. Accordingly, we conclude that, even assuming a privilege attached to these memoranda, the privilege was waived by the State's own actions.
In short, we conclude that neither memorandum is privileged, and in any event, any asserted privilege was waived as a result of the manner of production in this case. Although we conclude that the trial court erred in excluding the memoranda, we also conclude that its exclusion is not a basis to return this case to the trial court. Because this petition was filed as an original writ petition, we relinquished the proceeding to the trial court only for the purpose of conducting an evidentiary hearing to ascertain the facts. Accordingly, we will consider the Dyehouse memoranda in consideration of the Eighth Amendment claim, specifically Lightbourne's claim of the inadequacy of the procedures in assessing consciousness.

EIGHTH AMENDMENT CHALLENGE
At the outset, we emphasize what this claim is about and what this claim is not about. The claim is not about whether the death penalty is per se unconstitutional or whether lethal injection is per se unconstitutional under the Eighth Amendment. The claim is specifically about whether the method of execution through lethal injection, as currently implemented in Florida, is unconstitutional because it constitutes cruel and unusual punishment. Because the Court has already upheld the method of lethal injection against attacks beginning with Sims v. State, 754 So.2d 657 (Fla.2000), the more specific inquiry is whether the concerns raised as a result of the execution of Angel Diaz and the response of the executive branch to those concerns compel us to recede from the essential holding of Sims which upholds as constitutional lethal injection as administered in Florida. The exact constitutional measuring stick, based on our own precedent and United States Supreme Court precedent, will be further discussed with due regard to the specifics of the evidence adduced in this case and the claims raised.
CRUEL AND UNUSUAL PUNISHMENT: ANALYSIS OF UNITED STATES SUPREME COURT PRECEDENT
We begin with acknowledging as critical that in 2002, the Florida Constitution was amended to provide that Florida's interpretation of the cruel and unusual punishment clause is be construed in conformity with the United States Supreme Court's decisions. The amendment specifically provides:
The death penalty is an authorized punishment for capital crimes designated by the legislature. The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution. Any method of execution shall be allowed, unless prohibited by the United States Constitution. Methods of execution may be designated by the legislature, and a change in any method of execution may be applied retroactively.
*335 Art. 1, § 17, Fla. Const. (emphasis added). Accordingly, we must evaluate whether lethal injection is unconstitutional "in conformity with decisions of the United States Supreme Court." Id.
The Eighth Amendment forbids the infliction of "cruel and unusual punishments."[7] This amendment has been applied to claims regarding the method and type of punishment (such as to electrocution), to claims involving a particular class of individuals (such as to minors or those who are mentally retarded), to claims of excessive punishment (such as to the death penalty per se), and to claims involving prison conditions. A claim, as here, that the lethal injection procedures are unconstitutional is a method of execution challenge, and we will primarily limit our discussion to those cases.
The Eighth Amendment has historically been the vehicle used to measure whether a particular method of execution was permissible. See Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1878) (holding that the sentence of being shot until the inmate was dead did not violate the Eighth Amendment). The Eighth Amendment also addresses whether a particular type of punishment is excessive for the crime. In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), the United States Supreme Court was faced with the question of whether the imposition of the death sentence itself constitutes cruel and unusual punishment.
The plurality in Gregg recognized that the earliest Eighth Amendment cases dealt primarily with determining whether particular methods of execution were too cruel to pass constitutional muster, although the death sentence itself was not at issue. 428 U.S. at 170, 96 S.Ct. 2909. Relying on the prior decision in Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910), Justice Stewart explained the principles behind the Eighth Amendment as follows:
[T]he Court has not confined the prohibition embodied in the Eighth Amendment to "barbarous" methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner. The Court early recognized that "a principle to be vital, must be capable of wider application than the mischief which gave it birth." Weems v. United States, 217 U.S. 349, 373[, 30 S.Ct. 544, 54 L.Ed. 793] (1910). Thus the Clause forbidding "cruel and unusual" punishments "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." Id., at 378, 30 S.Ct. 544.
Gregg, 428 U.S. at 171, 96 S.Ct. 2909 (emphasis added). Accordingly, the plurality stated that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id. at 173, 96 S.Ct. 2909 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)).[8] In making this assessment, courts are to look to objective indicia that reflect the public attitude and ensure the *336 penalty accords with the dignity of man, including whether it is inhumane or is excessive. A punishment is excessive if: (1) the punishment involves the "unnecessary and wanton infliction of pain"; or (2) the punishment is grossly out of proportion to the severity of the crime. Id. As the plurality stressed, the role of the judicial branch is limited; courts cannot require the legislature to select the least severe penalty so long as the penalty is not inhumane or disproportionate to the crime. Gregg, 428 U.S. at 175, 96 S.Ct. 2909. Instead, courts must presume validity when assessing a punishment that was selected by a democratically elected legislature. Id.
After discussing this background, the plurality then turned its attention to whether the death penalty itself was constitutional. In making this determination, Justices Stewart, Powell, and Stevens reviewed the common law, the history of capital punishment, whether society currently endorsed capital punishment as a necessary criminal sanction, and whether the punishment comports with the basic concept of human dignity, and concluded that there was no constitutional ban on this form of punishment.
In short, while Gregg v. Georgia addressed whether the penalty of death violated the Eighth Amendment and first introduced the "unnecessary and wanton infliction of pain" standard, that case was not a "method of punishment" case but instead addressed a challenge to the excessiveness of the punishment. See also Weems, 217 U.S. at 382, 30 S.Ct. 544 (holding that a sentence of fifteen years of imprisonment for the crime of the falsification of a public and official document was cruel and unusual punishment); Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding that the Eighth Amendment imposes substantive limits on what can be made criminal and punished, and to that end, a state cannot criminalize an illness like a narcotic addiction without violating the Eighth Amendment); Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding that the sentence of death for the crime of rape of an adult woman was a "grossly disproportionate and excessive punishment" and thus forbidden by the Eighth Amendment).
Few United States Supreme Court cases address whether a method of execution violates the Eighth Amendment. In Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878), the Court considered its first case regarding a challenge to a method of execution. In that case, the petitioner was sentenced to be "publicly shot until you are dead." Id. at 131. In analyzing this claim, the Court first reviewed typical laws providing for execution, most of which involved execution by hanging or shooting, and then contrasted those methods of execution to some forms of execution from pre-revolutionary times in England, including being emboweled alive, beheaded, and quartered; public dissection; and burning alive. The Court did not set forth a specific standard to apply to these claims, but found that the sentence at hand did not fall within the same category as those involving torture: "Cruel and unusual punishments are forbidden by the Constitution, but the authorities referred to are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that category, within the meaning of the eighth amendment." Id. at 134-35. The Court did not provide significant guidance as to what constitutes cruel and unusual punishment, stating: "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides *337 that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." Id. at 135-36.
Twelve years later, the Court issued another method of execution case. See In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In that case, the petitioner asserted that his sentence of death by electrocution was cruel and unusual punishment within the meaning of the Eighth Amendment. At the time, electrocution was a new method of execution and was statutorily authorized in New York after a state legislative commission found that it was the most humane method of execution and much less barbaric than hanging. After noting its prior holding in Wilkerson, the United States Supreme Court provided more analysis as to the meaning of cruel and unusual punishment: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life." Id. at 447, 10 S.Ct. 930. The Court concluded that electrocution, as a more humane form of execution, did not constitute cruel and unusual punishment.
Electrocution gradually became the accepted method of execution over the next century for those states that had a death penalty. Since 1890, the Court has not specifically decided a method of execution case. One opinion comes close, although the circumstances of that case are slightly different. In Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the state attempted to use the electric chair to execute Willie Francis, a convicted murderer, but due to a mechanical failure that occurred, Francis did not die. Francis asserted that a second attempt to electrocute him would violate the double jeopardy clause and would constitute cruel and unusual punishment in violation of the Eighth Amendment. The Court denied Francis's claim that a second attempt at electrocution would subject him to a lingering death or cruel and unusual punishment, holding as follows:
Even the fact that petitioner has already been subjected to a current of electricity does not make his subsequent execution any more cruel in the constitutional sense than any other execution. The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution. The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block.
Id. at 464, 67 S.Ct. 374 (emphasis added).
The final case that bears on the United States Supreme Court precedent is Hill v. McDonough, ___ U.S. ___, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), wherein a Florida death row inmate sought to challenge whether Florida's three-drug protocol violates the cruel and unusual punishment clause. The issue before the United States Supreme Court was narrow: whether *338 Hill's claim must be brought by a writ of habeas corpus, as statutorily authorized by 28 U.S.C. § 2254, or whether it may proceed as an action for relief under 42 U.S.C. § 1983, which is generally used to challenge an inmate's condition of confinement. The Court distinguished between these two vehicles, holding that habeas corpus is to challenge the lawfulness of the confinement or the particulars affecting its duration, while a challenge to the circumstances of the confinement may be brought under § 1983. The Court held that because the challenged protocol, including the three-drug mix, was not mandated by law, the injunctive relief sought would not prevent the State from implementing the sentence; hence, the claim was not a challenge to the sentence itself and not cognizable under a habeas action. Id. at 2101. In reaching this decision, the Court noted that Hill's complaint was that the protocol allegedly causes a "foreseeable risk of . . . gratuitous and unnecessary" pain and that other methods of lethal injection would be constitutional. Id. at 2102. While the Supreme Court did not explicitly adopt this standard, other courts have begun to use the "foreseeable risk" standard.[9]
State and federal courts have used an array of standards in gauging what constitutes a sufficient risk such that the protocol for lethal injection violates the Eighth Amendment's prohibition against cruel and unusual punishment. A number of courts use a "substantial risk" standard.[10]See, e.g., Baze v. Rees, 217 S.W.3d 207, 209 (Ky.2006) (holding that in order for a method of execution to be considered cruel and unusual punishment, the procedure for execution must create "a substantial risk of wanton and unnecessary infliction of pain, torture or lingering death"), cert. granted, ___ U.S. ___, 128 S.Ct. 34, 168 L.Ed.2d 809 (U.S. 2007); Taylor v. Crawford, 487 F.3d 1072, 1080 (8th Cir.2007) ("If Missouri's protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis."); LaGrand v. Stewart, 173 F.3d 1144, 1149 (9th Cir.1999) (holding that the district court's findings of "extreme pain, the length of time this extreme pain lasts, and the substantial risk that inmates will suffer this extreme pain for several minutes require the conclusion that execution by lethal gas is cruel and unusual"). The United States District Court in Morales declared that the operative issue is whether the lethal injection protocol, as actually administered in practice, creates an undue and unnecessary risk that an inmate will suffer pain so extreme that it offends the Eighth Amendment. See Morales v. Hickman, 415 F.Supp.2d 1037 (N.D.Cal.), aff'd, 438 F.3d 926 (9th Cir.), cert. denied, 546 U.S. 1163, 126 S.Ct. 1314, 163 L.Ed.2d *339 1148 (2006). However, a number of other courts have used different standards, including "an undue and unnecessary risk,"[11] a "foreseeable risk,"[12] and a "constitutionally significant risk."[13] Some courts have even used the "deliberate indifference" standard, although our review of the United States Supreme Court case law demonstrates that phrase has been used in connection with prison condition cases, not method of execution cases.[14]
We recognize that the Court recently granted certiorari jurisdiction in Baze v. Rees, ___ U.S. ___, 128 S.Ct. 34, 168 L.Ed.2d 809 (U.S. 2007), to review a Kentucky Supreme Court decision which held that Kentucky's protocol for lethal injection did not violate the Eighth Amendment. In the Baze petition, the petitioners urge the United States Supreme Court to adopt a standard that would interpret the Eighth Amendment to prohibit a method of execution that creates "an unnecessary risk of pain and suffering." Petitioner's Petition for Writ of Certiorari at 6, Baze v. Rees, No. 07-5439, (U.S. Sept. 25, 2007). Still, given the current uncertainty in the exact standard that the United States Supreme Court might employ, we deem it important to review our own precedent as to this issue.

FLORIDA'S JURISPRUDENCE ON METHOD OF EXECUTION
Although the issue in this case is the constitutionality of lethal injection procedures, a review of this Court's jurisprudence involving challenges to electrocution, the previous method used in Florida, is instructive. In Buenoano v. State, 565 So.2d 309 (Fla.1990), the petitioner challenged whether the electric chair violated the Eighth Amendment, based on a malfunction during the execution of inmate Jesse Tafero. The governor ordered an investigation into the circumstances of Tafero's execution, and it was determined that a synthetic sponge caused the smoke and flames to shoot from his head. The attending physician and the medical examiner both stated that the first surge of electricity caused Tafero to become unconscious so he did not suffer.
Buenoano asserted that a faulty electrode in the electric chair did not properly conduct electricity and that the DOC was not competent to carry out executions. This Court found that Buenoano's claim *340 was not procedurally barred, but denied relief, holding that execution is clearly within the province of the executive branch and that the record as proffered did not justify judicial interference with the executive function. Id. at 311. Relying on the United States Supreme Court's decision in Resweber, 329 U.S. at 463, 67 S.Ct. 374, the Court held that "one malfunction is not sufficient to justify a judicial inquiry into the Department of Corrections' competence." Buenoano, 565 So.2d at 311.
In 1997, a similar malfunction occurred during the execution of Pedro Medina, where flames and smoke again erupted from the headpiece shortly after the electrocution began. Leo Jones, who was under a warrant of death, filed a petition to invoke this Court's all writs jurisdiction, challenging whether Florida's electric chair in its then-present condition violated the Eighth Amendment. Jones v. State, 701 So.2d 76 (Fla.1997). This Court stayed the pending execution and relinquished jurisdiction to the trial court for an evidentiary hearing. The trial court denied relief, finding that the electric chair was working properly and that inmates did not suffer conscious pain within a millisecond of the initial surge of electricity.
Jones appealed to this Court, raising an Eighth Amendment challenge. Jones asserted that a state official's failure to prevent harm to prisoners constitutes cruel and unusual punishment if the official shows "deliberate indifference to the prisoner's well-being" and thus the trial court erred by requiring him to show electrocuted inmates experienced conscious pain. Id. at 79. Jones then argued that the state has shown "deliberate indifference" through its executions. After rejecting Jones' contention as "totally without merit," the Court held:
In order for a punishment to constitute cruel or unusual punishment, it must involve "torture or a lingering death" or the infliction of "unnecessary and wanton pain." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). As the Court observed in Resweber: "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely."
Id. The Court then noted that there was substantial evidence that Florida executions are conducted "without any pain whatsoever" and that the record was devoid of evidence "suggesting deliberate indifference to a prisoner's well-being."[15]
*341 Following Jones, challenges to the electric chair continued. In 1999, Thomas Provenzano asserted that the electric chair in its then-present condition constituted cruel or unusual punishment, alleging that it malfunctioned in the four executions since the Court's decision in Jones. Provenzano v. State, 739 So.2d 1150, 1153 (Fla.1999) (Provenzano I). The trial court rejected all of Provenzano's claims concerning the electric chair, finding most of the claims were decided adversely to him in Jones. The trial court further rejected Provenzano's claim as to newly discovered evidence pertaining to electrical engineers that contracted with the DOC to work on the chair, holding that the fact that the DOC was actively testing and maintaining the chair established that the DOC was attempting to maintain the reliability of the electric chair. On appeal, this Court held that the trial court did not err in relying on Jones and noted that this Court had repeatedly rejected the claim that death was not instantaneous. Id. at 1153. The Court further affirmed the trial court's holding that evidence pertaining to recent work on the electric chair is insufficient to overcome the presumption that members of the executive branch will properly perform their duties in carrying out the next execution. Id. Despite the Court's holding, the Court expressed concern that the DOC had repeatedly failed to follow the protocol established for executions. However, because there was no showing that any of the last four executions caused "unnecessary and wanton pain" or that they involved "torture or a lingering death," the Court declined the stay of execution. Id. at 1154.[16]
Shortly after Provenzano I, in Provenzano v. Moore, 744 So.2d 413 (Fla.1999) (Provenzano II), the Court stayed Provenzano's execution after problems occurred during inmate Allen Lee Davis's execution and permitted another evidentiary hearing before the trial court. In Provenzano II, the Court again affirmed its statement in Jones: "[I]n order for a punishment to constitute cruel or unusual punishment, it must involve `torture or a lingering death' or the infliction of `unnecessary and wanton pain.'" Id. at 415 (quoting Jones, 701 So.2d at 79). The Court stressed that "[t]he record in this case reveals abundant evidence that execution by electrocution renders an inmate instantaneously unconscious, thereby making it impossible to feel pain." Id. at 415. The Court also concluded that based on the record, the electric chair was functioning properly, and the electric circuitry was being maintained. While holding that the execution protocol was followed in the Davis execution, we also observed that "it may be appropriate for DOC to revisit the protocol, including the use of the mouth strap, to ensure that it is consistent with the functioning of the electric chair." Id. We rejected Provenzano's claim that the current use of electrocution is unconstitutional because it "violates the evolving standards of decency that mark the progress of a maturing society." Id.

HISTORY OF LETHAL INJECTION IN FLORIDA
In 2000, the Florida Legislature provided for a new method of execution: lethal injection. See ch.2000-1, § 1, Laws of Fla.[17] Section 922.105(1) now provides: "A *342 death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." See § 922.105(1), Fla. Stat. (2006). The statute does not provide the specific procedures to be followed or the drugs to be used in lethal injection; instead it expressly provides that the policies and procedures created by the DOC for execution shall be exempt from the Administrative Procedure Act, chapter 120, Florida Statutes. See § 922.105(7), Fla. Stat. (2006); Sims v. State, 754 So.2d 657, 670 (Fla.2000).
Shortly after the amendment of section 922.105, Terry Sims challenged the lethal injection protocol in effect in 2000 as failing to provide sufficient details and procedures for administering lethal injection. Sims, 754 So.2d at 666. The issues raised by Sims included: reported problems in correctly administering lethal injections in other states; lack of guidelines for handling problems that may occur; lack of specification as to the duties of each participant; and conflict between the protocol and testimony as to what should occur if the inmate does not expire after the initial injections. Id.
At an evidentiary hearing before the circuit court, Sims presented expert testimony concerning specific examples of "botched" executions that occurred in other states. He further presented expert testimony concerning potential problems such as too low a dose of sodium pentothal being administered, which would make pain more acute, or the drugs not being given in the proper order. It was undisputed in Sims that the dosage levels set forth in the protocol, if administered correctly, would result in a quick and relatively painless death. The Court rejected Sims' claim that the DOC's execution day protocol failed to provide sufficient details and procedures for administering lethal injection, relying upon LaGrand v. Lewis, 883 F.Supp. 469 (D.Ariz.1995), aff'd sub nom. LaGrand v. Stewart, 133 F.3d 1253 (9th Cir.1998), where that court held that the Arizona lethal injection protocol did not expose a prisoner to "more than a negligible risk of being subjected to a cruel and wanton infliction of pain." Sims, 754 So.2d at 667 (quoting LaGrand, 883 F.Supp. at 471). After noting that Sims raised similar challenges to the sufficiency of the written protocol and after reviewing all of the evidence presented in that case, this Court denied Sims' challenge, concluding:
Sims' reliance on Professor Radelet and Dr. Lipman's testimony concerning the list of horribles that could happen if a mishap occurs during the execution does not sufficiently demonstrate that the procedures currently in place are not adequate to accomplish the intended result in a painless manner. Other than demonstrating a failure to reduce every aspect of the procedure to writing, Sims has not shown that the DOC procedures will subject him to pain or degradation if *343 carried out as planned. Sims' argument centers solely on what may happen if something goes wrong. From our review of the record, we find that the DOC has established procedures to be followed in administering the lethal injection and we rely on the accuracy of the testimony by the DOC personnel who explained such procedures at the hearing below. Thus, we conclude that the procedures for administering the lethal injection as attested do not violate the Eighth Amendment's prohibition against cruel and unusual punishment.
Sims, 754 So.2d at 668. After this Court rejected Sims' challenges to the lethal injection protocol, the United States Supreme Court denied certiorari review. See Sims v. Florida, 528 U.S. 1183, 120 S.Ct. 1233, 145 L.Ed.2d 1122 (2000).
In the same year Sims was decided, this Court decided Provenzano v. State, 761 So.2d 1097 (Fla.2000) (Provenzano III), upholding lethal injection as follows:
[T]his Court [previously] stated that there is a presumption that the members of the executive branch will properly perform their duties in carrying out an execution. The circuit court determined that there has been no showing of abuse or cruel or unusual punishment in this case. There is competent, substantial evidence in the record to support this conclusion. Therefore, we hold that execution by lethal injection does not amount to cruel and/or unusual punishment.
Id. at 1099 (citation omitted). The Sims holding has been since reaffirmed in many cases.[18]See, e.g., Diaz v. State, 945 So.2d 1136, 1144 (Fla.2006); Rolling v. State, 944 So.2d 176, 179 (Fla.2006); Rutherford v. State, 926 So.2d 1100, 1113 (Fla.2006); Hill v. State, 921 So.2d 579, 583 (Fla.2006); Parker v. State, 904 So.2d 370, 380 (Fla. 2005); Thompson v. State, 796 So.2d 511, 515 (Fla.2001); Bryan v. State, 753 So.2d 1244, 1254 (Fla.2000).

THIS CASE
With this legal background in mind, we turn to the primary issue for us to decide in this case: whether the lethal injection procedures currently in place in Florida, as actually administered, violate the constitutional prohibition against cruel and unusual punishment. We start from the proposition that in Sims we upheld the constitutionality of lethal injection and the chemicals employed during lethal injection against a challenge that the procedures in effect in 2000 did not provide sufficient detail for administering lethal injection. There are two reasons that we revisit our *344 holding in Sims, which was decided shortly after lethal injection was adopted.
First, in Sims we rejected as speculative Sims' arguments concerning the "list of horribles" that Sims argued could occur in a lethal injection execution, holding that the testimony presented did not "sufficiently demonstrate that the procedures currently in place are not adequate to accomplish the intended result in a painless manner." Sims, 754 So.2d at 668. We noted that "Sims' argument centers solely on what may happen if something goes wrong." Id. In the Diaz execution, we now have actual experience of complications that can arise in the carrying out of a lethal injection execution. However, rather than ignoring what might have gone wrong during the Diaz execution, the executive branch under the direction of the Governor and the DOC instituted an extensive and comprehensive review of the problem and proposed solutions, many of which have been enacted by the DOC.
The second and more important difference is that the protocol has become increasingly more specific and more detailed as to the drugs administered and the procedures to be followed. Yet, Lightbourne still criticizes the protocol as inadequate to prevent the unnecessary risk of pain and in fact claims that the most recent revisions are essentially no more than "window dressing."
Most of Lightbourne's claims rely on the assertion that Diaz suffered pain during his execution and that the current protocol does not adequately guarantee that this risk is sufficiently minimized so as to comply with the Eighth Amendment. However, as the trial court noted, the Governor's Commission could not determine whether Diaz suffered pain and the trial court found that "it is unclear and disputed whether inmate Diaz suffered any pain." The trial court ultimately concluded that Diaz did not suffer any pain, stating as follows:
It is unclear and disputed whether inmate Diaz suffered any pain. It is unclear exactly how conscious or unconscious inmate Diaz was after injection of the sodium pentothal into the soft body tissue. It is unknown what the absorption rate is for that chemical or the other chemicals injected into soft body tissue. It is medically clear that anyone would experience pain if pancuronium bromide or potassium chloride were injected into a body that was not properly anesthetized. It is not uncommon for this to happen in the best of hospital settings. Medical experts testified to patients screaming or yelling from severe pain from injection of drugs before being properly anesthetized. No witness testified that inmate Diaz screamed or yelled after the injection of pancuronium bromide or potassium chloride. Therefore, the Court concludes and so finds that inmate Diaz did not suffer any pain from the process of injecting these chemicals. The Governor's Commission which investigated this execution could not find whether or not inmate Diaz suffered any pain.
In reviewing the trial court's order and the facts as developed in the evidentiary hearing, we note that it is undisputed that in the execution of Angel Diaz, the intravenous lines were not functioning properly because the catheters passed through his veins in both arms and thus delivered the lethal chemicals into soft tissue, rather than into his veins. Lay witnesses to the execution, including Mr. Diaz's spiritual advisor, an interpreter, and a press representative, testified that several minutes after the injections began, Diaz was still moving, squinting, taking deep breaths, and clenching his jaw. It is also undisputed that if pancuronium bromide or potassium *345 chloride, the second and third chemicals administered, are injected into a conscious person, significant pain would result from each of the chemicals.
The medical experts differed in opinion as to whether the subcutaneously injected sodium pentothal was absorbed into Diaz's blood stream to a sufficient degree to prevent him from feeling the effects of the pancuronium bromide and potassium chloride. Lightbourne's expert, Dr. Heath, a board certified anesthesiologist, could not say with certainty whether Diaz was "awake" when the second and third drugs were administered and also could not say with certainty which drug caused Diaz's death. Based on the witness observations, he opined that Diaz likely suffocated from the pancuronium bromide. On the other hand, Dr. Kris Sperry, chief medical examiner for the State of Georgia, testified for the State and opined that Diaz did not feel the pain of injection of potassium chloride, which caused blisters under his skin, because "he had already been given the sodium pentothal, which is what would have rendered him unconscious and insensate." Dr. Sperry did concede the possibility that if the sodium pentothal was injected into soft tissue, its effect would be delayed, and Diaz could have felt the suffocating effects of the pancuronium bromide, although in his opinion, the sodium pentothal would be absorbed before the remaining two chemicals.
Because it is disputed whether or not Diaz suffered pain, we view this issue based on what is undisputed: if Diaz was not unconscious before the other drugs were injected, he would have indeed suffered unnecessary pain. Therefore, we evaluate the procedures with the knowledge that the execution of Diaz raised legitimate concerns about the adequacy of Florida's lethal injection procedures and the ability of the DOC to implement them.
As the amount and sequence of chemicals used in Florida have not changed from the time of the Diaz execution, we begin with a review of the combination of chemicals administered under the current lethal injection procedures. Specifically, the protocols in effect both at the time of the Diaz execution (the August 2006 procedures) and at the present time (the August 2007 procedures) provide for intravenous administration of five grams of sodium pentothal[19] (a fast-acting sedative), 100 milligrams of pancuronium bromide (a paralytic agent that can stop respiration), and 240 milliequivalents of potassium chloride (a substance that will cause the heart to stop).[20] A saline solution is injected before a new drug is administered in order to clear the line between chemicals.
After the Diaz execution, the report of the Governor's Commission suggested that the Governor have the DOC "on an ongoing basis explore other more recently developed chemicals for use in a lethal injection execution with specific consideration and evaluation of the need of a paralytic drug like pancuronium bromide in an effort to make the lethal injection execution procedure less problematic." However, *346 the Commission did not expressly recommend any modification to the current three-drug protocol or to the individual amounts of the chemicals used in the lethal injection procedures.
The Commission did make a number of other specific recommendations, including that DOC: develop written procedures to clearly establish the chain of command and include that the warden has the final decision-making authority; require documentation as to all stages of the lethal injection process; add a second Florida Department of Law Enforcement (FDLE) agent and require that both keep documented logs during the execution; develop and implement a process to determine the most suitable method of venous access which does not require movement of the inmate after venous access is obtained; ensure the inmate is unconscious after sodium pentothal is administered and proceed no further until the warden authorizes the team to do so; require that if a second IV site is utilized at any time, that the entire lethal chemical administration process be reinitiated from the beginning; develop procedures that clearly establish and define the role of each person; develop a training program for all persons involved; and review foreseeable contingencies and formulate responses to those contingencies. In light of these recommendations and its own examination of the Diaz execution, the DOC first revised its procedures, effective May 9, 2007 (the May 2007 procedures). After additional questions were expressed by the trial court in this case and as part of its own continuing internal review, the DOC revised its lethal injection procedures again, resulting in the August 2007 procedures. In the introduction to its August 2007 procedures, the DOC stated that the "foremost objective of the lethal injection process is a humane and dignified death."
This stated objective is reflected in the most significant difference between the August 2006 procedures under which Diaz was executed and the May 2007 procedures: the inclusion of a pause during which the DOC personnel will assess the inmate for the presence or absence of unconsciousness. The August 2006 procedures that were in effect at the time of the Diaz execution did not require that any determination of unconsciousness be made before the pancuronium bromide was injected. The May 2007 procedures added the requirement that the team warden must "determine, after consultation, that the inmate is indeed unconscious. Until the inmate is unconscious and the Warden has ordered the executioners to continue, the executioners shall not proceed. . . ." Further, the warden is required to stop the execution at any point when venous access becomes compromised and must take appropriate action to remedy the problem before proceeding.
The August 2007 procedures are even more specific. These procedures require the warden to "assess whether the inmate is unconscious" after injection of the two syringes of sodium pentothal and the first saline syringe. If the inmate is not determined to be unconscious at that point, the warden shall suspend the execution process, order the window closed, and consider a secondary access site. The August 2007 procedures make clear that the process of assessing consciousness is a critical step that must be conducted before the execution proceeds. The August 2007 procedures state that the warden makes the determination of consciousness "after consultation."[21]
*347 As to the critical issue of consciousness, Warden Cannon, who is currently designated by the Secretary of the DOC as team warden in charge of future executions, testified that he would assess consciousness by employing an "eyelash touch," calling the inmate's name, and shaking the inmate. Warden Cannon testified that if there is a disagreement as to consciousness, the execution will be temporarily suspended  the curtains will close and the medical team members will come out from the chemical room and consult in the assessment of the inmate. When a determination of unconsciousness is made, the curtains will reopen, and the process will continue. Under the August 2007 procedures, the second and third drugs will not be administered until the inmate is deemed unconscious and the warden orders that the execution proceed.
While the August 2007 procedures do not expressly state that a medically qualified team member will continuously monitor the IV sites, Warden Cannon testified that he will require the person who inserted the IV lines to monitor by closed circuit television cameras each IV access point, as well as the inmate's face, throughout the execution process. This camera system is part of the renovated execution facility.
The Governor's Commission recommended that the DOC establish a clear hierarchy of authority and provide open communication between team members during the execution. The August 2007 procedures address these recommendations by establishing the position of "team warden" who is ultimately responsible for every aspect of the execution process and by providing that the security team members will be in radio contact with the team warden during the execution in order to report any problems that may occur. The August 2007 procedures state that "each execution member is responsible and authorized to raise concerns that become apparent during the execution and bring them to the attention of the team warden."
Lightbourne, however, contends that these changes are inadequate and submitted expert testimony, as well as the testimony of DOC personnel, in an attempt to show that the training, qualifications, and consciousness assessment under the new procedures were still insufficient. In support of this claim, Lightbourne relies primarily on the opinion of Dr. Heath. In an affidavit submitted to the trial court (which has been considered as record evidence), Dr. Heath stated that the revised August 2007 procedures fail to require that qualified personnel ensure a "surgical plane of anesthesia," which he considers essential. He found fault with the procedures calling for the determination of consciousness to be made by the warden, whom Dr. Heath characterized as one of the least qualified persons present to make such an assessment. According to Dr. Heath, the methods Warden Cannon would use to assess consciousness are inadequate when performed by a person without clinical experience. Because of ethical considerations surrounding any participation in lethal injection procedures, Dr. Heath did not provide any specific recommendations as to how to carry out the lethal injection procedure or to assess consciousness in a lethal injection setting. He did testify, however, that in a surgical setting, a surgical plane of anesthesia is required to ensure the person will be insensate to the painful procedures to follow and that this can be assessed accurately only by applying a noxious stimulus, such as a surgical incision, a pinch with a hemostat, or a needle prick. This determination should be made *348 by medically trained personnel positioned by the side of the person being assessed.
Dr. Heath criticized the Florida procedures for requiring administration of the drugs remotely from a separate room, making it difficult to monitor the "anesthetic depth." He alleges that, given their location outside the death chamber, the executioners and medically trained team members will not be able to hear the inmate, which also impedes assessment of "anesthetic depth." He concluded that the changes made in the August 2007 procedures were merely cosmetic.
Dr. Heath also disapproved the use of a syringe holder in which to place the syringes while they are being used to deliver the drugs because he believes it will impede any ability to detect "back pressure," which indicates if the IV is working correctly. He testified that competence in IV injections requires clinical experience because when an IV is not inserted properly into a vein, extravasation occurs and fluids flow outside the vein into surrounding tissue. Extravasation can sometimes be detected by looking at the patient and can also be determined by palpation of the site. He further testified that failure of the drug injectors to have clinical experience in intravenous drug injection fails to meet any reasonable standard. Lack of experience in the executioners, who inject the syringes into the IV, is exacerbated by the lack of clinically trained personnel at the bedside, who could palpate the IV site and observe any problems.
However, other experts disagreed with Dr. Heath's conclusions. Dr. Sperry testified that an appropriate method to assess consciousness is to put hands on the person's shoulders, shake them, and call their name. This is a basic neurological assessment of consciousness and responsiveness which lay persons are taught and which any paramedic, emergency medical technician, registered nurse, or licensed practical nurse knows. The technique is "extremely fundamental" and is also a part of cardiopulmonary resuscitation (CPR) training. As to any concerns with IV lines, Dr. Sperry testified that problems inserting IV lines are common even in a hospital setting. He also disagreed that the syringe-holding apparatus would interfere with the ability to feel resistance or "back pressure" since back pressure is felt through the plunger, not the barrel of the syringe. According to Dr. Sperry, the apparatus stabilizes the syringe and prevents a person from pulling back on the barrel of the syringe while pushing the drugs.
Lightbourne also challenged the training and qualifications of personnel who perform the lethal injection procedures. Warden Cannon testified in the evidentiary hearing as to this issue as well. As the designated team warden in charge of lethal injections, he selects the members of the execution team. He testified to the role of groups of the execution team: security team members; technical team members (or medical team); and executioners. In addition, two agents from the FDLE will monitor the actions of the execution team. The "medically qualified" team members are responsible for the chemicals and IVs necessary to carry out an execution. Two medical personnel insert IVs. Two medical personnel are on standby in case the execution requires a central venous line placement, which is a more complicated procedure for placing an IV. A pharmacist will mix the lethal chemicals. The pharmacist's license and credentials, as well as those of all the medically qualified personnel, are verified through the Department of Health, and a background check is conducted. Each member of the team has a back-up person trained to step into the designated role in the event of contingencies.
*349 Warden Cannon stated that team members are selected based on their training, licensure, certifications, background checks, and everyday duties. The medically qualified personnel must also be currently employed in the area of medical expertise for which they are selected and must perform their assigned functions in their daily duties. Warden Cannon explained that the executioners, who are not required to have any specific professional experience or certifications, will only inject the drugs into the IV lines after receiving instructions from the team warden. Warden Cannon testified that monthly training sessions are held and include mock executions where the team also practices their responses to problems which might arise like equipment failure or a blocked IV line. However, the IVs are not actually placed into a person, and Warden Cannon would simply call out the hypothetical contingency.
Lightbourne also points out that the August 2007 procedures place the responsibility on the team warden, normally not a medically trained individual, to make the final decision as to the unconsciousness of the inmate. Even though Warden Cannon, or likely any other team warden chosen for future executions, does not have medical training beyond basic CPR training, the August 2007 procedures state that the team warden shall make the consciousness assessment in consultation with other team members. Warden Cannon testified that he would consult with those members of the team who are medically qualified in making his determination.
After considering the findings of the DOC investigative teams, the findings of the Governor's Commission, the most recently adopted procedures, and all of the witnesses and evidence presented below, the trial court concluded that there was no Eighth Amendment violation. Based on our analysis of the evidence presented as discussed above and, based on the application of the law to the evidence as discussed below, we agree.

APPLICATION OF LAW TO THE FACTS OF THIS CASE
This Court's obligation is to ensure that the method used to execute a person in Florida does not constitute cruel and unusual punishment. Unlike prior methods of execution, Lightbourne does not assert that lethal injection is inherently cruel and inhumane, only that if it is not properly carried out, there will be a risk of unnecessary pain. This Court set forth the constitutional standard for method of execution claims in Jones v. State, 701 So.2d 76, 79 (Fla.1997), a standard which is based solely upon rulings from the United States Supreme Court:
In order for a punishment to constitute cruel or unusual punishment, it must involve "torture or a lingering death" or the infliction of "unnecessary and wanton pain." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). As the Court observed in Resweber: "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely."
Id. In Sims, we elaborated on our decision in Jones. Relying on LaGrand, which held that the punishment is not cruel and unusual if a state's protocol does not expose the prisoner to "more than a negligible risk of being subjected to cruel and wanton infliction of pain," we held that an inmate's speculative list of horribles that could happen is insufficient to demonstrate more than a negligible risk. Sims, 754 So.2d at 667 (quoting LaGrand, 883 *350 F.Supp. at 471). The mere possibility of human error or a technical malfunction cannot constitute a sufficient showing to meet this burden. See, e.g., Resweber, 329 U.S. at 464, 67 S.Ct. 374 (holding that an accident which occurred during the first attempt at execution did not render a second attempt an Eighth Amendment violation); Buenoano, 565 So.2d at 311 (holding that one malfunction is "not sufficient to justify a judicial inquiry into the Department of Corrections' competence"). Moreover, we held that the DOC need not reduce every minute detail of the lethal injection process to writing in order to pass constitutional muster. See Sims, 754 So.2d at 668.
Turning to this case, Lightbourne contends that the protocol fails to appropriately ensure proper training and certification of both the executioners and the technical team members and that the protocol fails to adequately assess and ensure unconsciousness.[22] Lightbourne does not assert that the amount of sodium pentothal is inadequate, thereby disavowing any agreement with the Lancet article, which had been the subject of prior challenges to lethal injection.[23] Lightbourne does not explicitly challenge the use of the three-drug combination, although he does question the necessity for the use of pancuronium bromide, given that the dosage of sodium pentothal is sufficient to cause death.[24]
It is important to review these claims in conjunction with each other since the chemicals used, the training and certification, *351 and the assessment of consciousness all affect each other. If all of the team members have the appropriate training, experience, and certification, the risk of complications will be greatly reduced. If the inmate's consciousness is appropriately assessed and monitored after the dosage of sodium pentothal is administered, he or she will not suffer any pain from the injection of the remaining drugs. In reviewing the alleged risk of an Eighth Amendment violation, whether framed as a substantial risk, an unnecessary risk, or a foreseeable risk of extreme pain, the interactions of these factors must be considered.
Again, Lightbourne's most significant challenge is not to the chemicals themselves, but to whether they will be administered "properly" and whether the protocol has sufficient safeguards in place to prevent harm in the event that, as in the Diaz execution, the protocol is not properly followed. Lightbourne expends considerable effort disputing whether the lethal injection procedures set forth sufficient detail as to the training, qualifications, and experience required for the executioners and the various medically qualified team members. While the lethal injection procedures do not spell out in exact detail what training each team member must have, they do provide significant guidance and clearly require that the medically qualified personnel chosen for the execution team have adequate certification and training for their respective positions.
Our precedent makes clear that this Court's role is not to micromanage the executive branch in fulfilling its own duties relating to executions. We will not second-guess the DOC's personnel decisions, so long as the lethal injection protocol reasonably states, as it does here, relevant qualifications for those individuals who are chosen.
The next significant issue raised by Lightbourne focuses on whether DOC's protocol for assessing consciousness is adequate. If the inmate is not fully unconscious when either pancuronium bromide or potassium chloride is injected, or when either of the chemicals begins to take effect, the prisoner will suffer pain. Pancuronium bromide causes air hunger and a feeling of suffocation, and potassium chloride burns and induces a painful heart attack.
If the sodium pentothal is properly injected, it is undisputed that the inmate will not feel pain from the effects of the subsequent chemicals. While we cannot determine whether Diaz suffered pain, as detailed above, the protocol has changed since the Diaz execution, with the most significant change consisting of a pause after the sodium pentothal is injected in order to assess the inmate's consciousness. The DOC has clearly attempted to reduce the risk that the human errors will occur in future executions.
Although Lightbourne suggests that trained medical personnel would do a better job of assessing consciousness, based on the evidence presented below and after reviewing the newly revised protocol, we cannot conclude that Lightbourne has sufficiently demonstrated that the alleged deficiencies rise to the level of an Eighth Amendment violation. A claim that the protocol can be improved and the potential risks of error reduced can always be made. However, as this Court has already recognized, the Eighth Amendment is not violated simply because there is a mere possibility of human error in the process.
Moreover, this claim must be reviewed in light of the testimony presented. As mentioned above, sodium pentothal is an extremely fast-acting sedative which will have an immediate effect if it is injected properly. According to Dr. Dershwitz, a *352 person will be rendered unconscious in a minute or less if only a few hundred milligrams are injected into the patient. In lethal injection procedures in which five grams of this chemical are injected, it should be clear that there is a problem if the inmate is still talking minutes after the injection, as occurred in Diaz's execution. Moreover, the August 2007 procedures requires the warden to determine that the inmate is indeed unconscious "after consultation." Warden Cannon also testified that he would consult the medically qualified members of his team in making this assessment. If the warden determines that there is a problem and the inmate is not unconscious, he must suspend the execution process and the execution team will assess the viability of the secondary access site. Once a viable access site has been secured, the team warden will order the execution to proceed, and the executioners will inject another five grams of sodium pentothal into the inmate. Thus, even if the first five grams of the drugs were injected subcutaneously and took longer to be absorbed into the inmate's system, the inmate would have a total of ten grams in his system by the time that the warden made his second assessment of unconsciousness, which is required before the pancuronium bromide is injected.
With regard to the Dyehouse memorandum recommending the use of a BIS monitor to more accurately assess the level of consciousness of the inmate, it might be beneficial to incorporate a device that could monitor the inmate's level of sedation to ensure the inmate will not experience subsequent pain of execution. However, the Court's role regarding the executive branch in carrying out executions is limited to determining whether the current procedures violate the constitutional protections provided for in the Eighth Amendment.
We do not believe that it is within this Court's purview to mandate the use of a specific device to assess consciousness. We reaffirm the Court's essential holding in Sims that "determining the methodology and the chemicals to be used are matters best left to the Department of Corrections." Sims, 754 So.2d at 670. Unless the United States Supreme Court intends for the judicial branch to exercise detailed supervisory authority over the process of lethal injection, we do not consider the failure of the DOC to incorporate the use of the BIS monitor to constitute an Eighth Amendment violation in itself.
Determining the specific methodology and the chemicals to be used are matters left to the DOC and the executive branch, and this Court cannot interfere with the DOC's decisions in these matters unless the petitioner shows that there are inherent deficiencies that rise to an Eighth Amendment violation. Lightbourne has failed to overcome the presumption of deference we give to the executive branch in fulfilling its obligations, and he has failed to show that there is any cruelty inherent in the method of execution provided for under the current procedures.
Alternatively, even if the Court did review this claim under a "foreseeable risk" standard as Lightbourne proposes or "an unnecessary" risk as the Baze petitioners propose, we likewise would find that Lightbourne has failed to carry his burden of showing an Eighth Amendment violation. As stressed repeatedly above, it is undisputed that there is no risk of pain if the inmate is unconscious before the second and third drugs are administered. After Diaz's execution, the DOC added additional safeguards into the protocol to ensure the inmate will be unconscious before the execution proceeds. In light of these additional safeguards and the amount of the sodium pentothal used, which is a lethal *353 dose in itself,[25] we conclude that Lightbourne has not shown a substantial, foreseeable or unnecessary risk of pain in the DOC's procedures for carrying out the death penalty through lethal injection that would violate the Eighth Amendment protections.

CONCLUSION
After reviewing the evidence and testimony presented below and the lethal injection procedures themselves, we affirm the circuit court's order denying relief for the reasons set forth above and deny Lightbourne's all writs petition. Lightbourne has failed to show that Florida's current lethal injection procedures, as actually administered through the DOC, are constitutionally defective in violation of the Eighth Amendment of the United States Constitution.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] The Court has authority to issue all writs necessary to the complete exercise of its jurisdiction, see art. V, § 3(b)(7), Fla. Const., based on the Court's ultimate jurisdiction under article V, section 3(b)(1) of the Florida Constitution. This Court accepted review of the all writs petition because an appeal relating to Lightbourne's successive claims for postconviction relief, including a claim challenging the constitutionality of the lethal injection procedures, was pending before this Court at the time in Lightbourne v. State, 956 So.2d 456 (Fla.2007) (No. SC06-1241).
[2] Lightbourne is a prisoner under sentence of death but with no outstanding death warrant. His conviction and death sentence were originally affirmed in Lightbourne v. State, 438 So.2d 380 (Fla.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). After a death warrant was signed, Lightbourne filed a motion for postconviction relief, which was denied by the circuit court. This Court affirmed the denial of postconviction relief in Lightbourne v. State, 471 So.2d 27 (Fla.1985). Lightbourne filed a petition for writ of habeas corpus in the federal district court, which initially stayed the execution until it ruled on the merits of the claim and ultimately denied relief. The district court denied relief, and the Eleventh Circuit affirmed the denial. Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Before his scheduled execution, Lightbourne filed another postconviction motion in state court which was summarily denied. We entered a stay of execution and granted relief in part, remanding one claim for an evidentiary hearing. Lightbourne v. Dugger, 549 So.2d 1364 (Fla.1989). Denial of relief was affirmed in Lightbourne v. State, 644 So.2d 54 (Fla.1994). Lightbourne filed another postconviction motion, which the trial court denied after an evidentiary hearing on part of the claims. This Court again remanded for another evidentiary hearing. Lightbourne v. State, 742 So.2d 238, 250 (Fla. 1999). After the evidentiary hearing, the circuit court denied relief, and this Court affirmed in Lightbourne v. State, 841 So.2d 431 (Fla.2003).
[3] The Governor's Commission on Administration of Lethal Injection, Final Report with Findings and Recommendations (March 1, 2007) ("Governor's Commission Report") at 8.
[4] Clarence Hill and Arthur Rutherford were executed by lethal injection prior to the Diaz execution. See Diaz v. State, 945 So.2d 1136, 1148 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006).
[5] Cf. Ragsdale v. State, 720 So.2d 203, 205 (Fla.1998) (holding that an attorney's notes and preliminary documents are not public records); Johnson v. Butterworth, 713 So.2d 985, 986 (Fla.1998) (holding that rough drafts and notes intended as "mere precursors" of agency records or made only to aid the attorney in remembering are not public records subject to disclosure under chapter 119).
[6] A five-part test has been applied to determine if the release is inadvertent. The court must consider: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production; (2) the number of inadvertent disclosures; (3) the extent of disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error. Abamar Hous. & Dev., Inc., 698 So.2d at 279.
[7] The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.
[8] Although both Gregg and Trop were plurality opinions, the Supreme Court has reaffirmed the importance of this principle numerous times. See, e.g., Atkins v. Virginia, 536 U.S. 304, 311-12, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 264 n. 4, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).
[9] See, e.g., Taylor v. Crawford, 487 F.3d 1072, 1079 (8th Cir.2007) ("While we do not imply that the Court [in Hill] thereby adopted a new constitutional standard, we do observe that the Court expressed no dissatisfaction with that statement of the issue [whether the protocol allegedly causes foreseeable risk of gratuitous and unnecessary pain], and further, we find it to be consistent with settled Eighth Amendment jurisprudence."), petition for cert. filed, 76 U.S.L.W. 3094 (U.S. Sept. 5, 2007) (No. 07-303); Harbison v. Little, 511 F.Supp.2d 872 (M.D.Tenn. 2007).
[10] United States Supreme Court cases addressing condition of confinement claims have used a "substantial risk" standard. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (recognizing that "conditions posing a substantial risk of serious harm" may rise to the level of an Eighth Amendment violation) (emphasis added).
[11] Morales v. Tilton, 465 F.Supp.2d 972, 974 (N.D.Cal.2006) (phrasing the issue as: "does California's lethal-injection protocol  as actually administered in practice  create an undue and unnecessary risk that an inmate will suffer pain so extreme that it offends the Eighth Amendment?"); Evans v. Saar, 412 F.Supp.2d 519, 524 (D.Md.2006) (holding that an inmate must show "that he is subject to an unnecessary risk of unconstitutional pain or suffering. . . . Inherent in this formulation is the requirement that the risk must be substantial.").
[12] Harbison v. Little, 511 F.Supp.2d 872, 881 (M.D.Tenn.2007) (holding that in determining the objective component, the court looked to whether there was "a foreseeable risk of . . . gratuitous and unnecessary pain").
[13] See Taylor, 487 F.3d at 1080 (emphasizing that the proper focus is not the risk of accident, but "whether the written protocol inherently imposes a constitutionally significant risk of pain"); Nooner v. Norris, No. 5:06CV00110SWW, 2007 WL 2710094, at *7 (E.D.Ark. Sept.11, 2007) (stating the standard as "whether the written protocol inherently imposes a constitutionally significant risk of pain").
[14] In fact, in this case Lightbourne argues that without "an adequate medical determination of unconsciousness before the administration of drugs known to produce pain and continuing monitoring of unconsciousness throughout the lethal injection procedure, there is a deliberate indifference to the risk of the infliction of unnecessary pain in violation of the Eighth Amendment."
[15] This Court did not explicitly adopt the "deliberate indifference" standard in Jones, but limited its analysis to the standard adopted by the United States Supreme Court in method of execution cases  the "inherent in the method" standard. Some federal courts have applied a "deliberate indifference" standard to method of execution cases to determine whether the wanton element was met in terms of the "unnecessary and wanton infliction of pain" standard. Again, it is important to note that this "deliberate indifference" standard was first mentioned by the United States Supreme Court when the Court expanded the Eighth Amendment protections to condition of confinement cases, and it has used the deliberate indifference standard only in those cases to determine a state actor's mental intent when that actor inflicted harm or potential harm that was not part of the prescribed punishment. See, e.g., Wilson v. Seiter, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (holding that in prison condition cases, a mental element must be attributed to the inflicting officer "[i]f the pain inflicted is not formally meted out as punishment . . . by the sentencing judge."). Here, death is clearly part of the penalty and thus United States Supreme Court precedent does not require a showing as to any mental element in this type of claim.
[16] The Court did require the DOC to provide an open file policy relating to "any information regarding the operation and functioning of the electric chair" and further directed the DOC to certify prior to any execution that the electric chair was able to perform consistent with the "Execution Day Procedures" and "Testing Procedures for Electric Chair."
[17] On October 26, 1999, the United States Supreme Court granted certiorari in Bryan v. Moore, 744 So.2d 452 (Fla.1999) (table), a case where the constitutionality of Florida's electric chair was at issue. Bryan v. Moore, 528 U.S. 960, 120 S.Ct. 394, 145 L.Ed.2d 306 (1999). In direct response, on December 7, 1999, Governor Bush announced that a special session of the Florida Legislature would be held for the sole purpose of considering a piece of legislation that would authorize that "death sentences be carried out by lethal injection or electrocution." After section 922.105, Florida Statutes, was amended to provide for lethal injection, the United States Supreme Court dismissed its grant of certiorari in Bryan as improvidently granted "[i]n light of the representation by the State of Florida, through its Attorney General, that petitioner's `death sentence will be carried out by lethal injection, unless petitioner affirmatively elects death by electrocution.'" Bryan v. Moore, 528 U.S. 1133, 1133, 120 S.Ct. 1003, 145 L.Ed.2d 927 (2000).
[18] Subsequent to Sims, a research study reported in a publication called The Lancet was offered in several cases as newly discovered evidence that execution by lethal injection exposes inmates to a substantial risk of unnecessary and wanton pain. See Leonidas G. Koniaris et al., Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (2005). This Court found the study to be inconclusive and did not justify holding an evidentiary hearing to review the newly discovered evidence claim. See Diaz v. State, 945 So.2d 1136, 1144 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006); Rolling v. State, 944 So.2d 176, 179 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 466, 166 L.Ed.2d 332 (2006); Rutherford v. State, 926 So.2d 1100, 1113-14 (Fla.), cert. denied, 546 U.S. 1160, 126 S.Ct. 1191, 163 L.Ed.2d 1145 (2006); Hill v. State, 921 So.2d 579, 583 (Fla.), cert. denied, 546 U.S. 1219, 126 S.Ct. 1441, 164 L.Ed.2d 141 (2006). As the Court explained in Hill, the study in The Lancet "does not assert that providing the inmate with `no less than two grams' of sodium pentothal, as is Florida's procedure, is not sufficient to render the inmate unconscious. Nor does it provide evidence that an adequate amount of sodium pentothal is not being administered in Florida, or that the manner in which this drug is administered in Florida prevents it from having its desired effect." Hill, 921 So.2d at 583 (citation omitted) (quoting Sims, 754 So.2d at 665 n. 17).
[19] Sodium pentothal is a brand name, which is the name used in Florida's lethal injection protocol. This drug is also known by its chemical name, thiopental sodium.
[20] Challenges to the mix of chemicals have been a recurrent theme both in this State and around the country. Notably, this Court has previously rejected requests for evidentiary hearings on the issue of whether Florida's lethal injection procedures that directed that an inmate receive "no less than two" grams of sodium pentothal provided inadequate anesthesia. Hill v. State, 921 So.2d 579, 583 (Fla.2006); see Rutherford v. State, 926 So.2d 1100, 1114 (Fla.2006). Florida's protocols now direct that an inmate be given five grams of sodium pentothal.
[21] We acknowledge, however, that while the procedures as well as the checklist now in use require an assessment of consciousness, neither the procedures nor the checklist specifies what procedures are to be followed for such an assessment or with whom the warden is to consult.
[22] Lightbourne raises the following specific allegations regarding the sufficiency of the August 2007 procedures: the revised procedures do not meaningfully increase the qualifications of executioners; there is no requirement that the team warden or executioners have experience in conducting executions; the protocol does not require that training sessions use more accurate simulations than pushing syringes into a bucket; there is no reason for using a syringe holder; positioning executioners in a separate room from the inmate results in long lengths of IV tubing, which creates greater opportunity for malfunction; the procedures do not specifically indicate the qualifications needed by each designated team member; phlebotomists are not trained to place catheters in veins; the procedures leave inmates to guess if the execution team members are adequately experienced and "medically qualified"; the warden is not qualified to make hiring decisions regarding medical personnel; the procedures do not provide any method for monitoring the inmate's consciousness after administration of sodium pentothal, and the warden is not qualified to make this assessment; anesthetic depth should be assessed by a variety of indicators to reach an accurate reading; the warden is not qualified to make the final decision regarding the appropriate method of obtaining venous access; pancuronium bromide is used for purely cosmetic reasons; the contingency portion of the protocols does not detail any responses to contingencies; and the certification portion of the protocols does not result in individual accountability of team members. In a related case where another inmate is also challenging the protocol after a death warrant was signed in his case, Mark Dean Schwab raises similar concerns, focusing primarily on whether the protocols adequately ensure the assessment of consciousness and whether the use of a paralytic drug during the execution is warranted. See Schwab v. State, No. SC07-1603, 969 So.2d 318, 2007 WL 3196523 (Fla. Nov. 1, 2007).
[23] Both Lightbourne's expert, Dr. Heath, and the State's expert, Dr. Dershwitz, testified at the evidentiary hearing and criticized The Lancet article that claimed inadequate thiopental sodium has been used in executions, asserting that the study employed flawed methodology and the conclusions are not supported by the data because of the delay in drawing blood. See supra note 18.
[24] The petition for certiorari filed in Baze v. Rees raises as the third issue whether "the continued use of sodium thiopental, pancuronium bromide and potassium chloride, individually or together, violate the cruel and unusual punishment clause because lethal injections can be carried out by using other chemicals that pose less risk of pain."
[25] As defense counsel conceded during oral argument, there was no evidence presented that once the five-gram dose of sodium pentothal has been properly administered and an inmate is rendered unconscious, there is any likelihood that he will become conscious during the execution, even if the procedure lasts for thirty minutes or more. The evidence clearly established that this dose is lethal and once unconsciousness is reached, the inmate will slip only deeper into unconsciousness until death results. This conclusion is borne out by the medical testimony.